1 │ Daniel D. Harshman (SBN 177139)
  │ ejackson@cozen.com
2 │ COZEN O'CONNOR
  │ 777 South Figueroa Street, Ste. 2850
3 │ Los Angeles, California 90017
  │ Telephone:  213.892.7900
4 │ Facsimile:  213.892.7999

5 │ Attorneys for Plaintiffs and Movants

6 │

7 │

8 │                    UNITED STATES DISTRICT COURT
  │           FOR THE CENTRAL DISTRICT OF CALIFORNIA
9 │

10 │ IT'S MY PARTY, INC. and IT'S MY              Case No.: 1:09-cv-00547-JFM
   │ AMPHITHEATRE,
11 │
   │                                             **JOINT STIPULATION RE:**
12 │            Plaintiffs,                       **PLAINTIFFS' MOTION TO COMPEL**
   │                                             **THIRD-PARTY WILLIAM MORRIS**
13 │        vs.                                   **ENDEAVOR ENTERTAINMENT, LLC**
   │                                             **TO RESPOND TO PLAINTIFFS'**
14 │ LIVE NATION, INC.,                          **REQUESTS FOR PRODUCTION OF**
   │                                             **DOCUMENTS PURSUANT TO FRCP 37**
15 │            Defendant.
16 │                                              Date:
   │                                              Time:
17 │                                              Place:

18 │                                              Discovery Cut-Off:  November 30,
   │                                                      2010
19 │

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

# TABLE OF CONTENTS

**Page**

MOVANTS' INTRODUCTORY STATEMENT…………………………......1

WME'S INTRODUCTORY STATEMENT IN OPPOSITION………………..3

MOVANTS' STATEMENT OF FACTUAL BACKGROUND .......................5

    A.    Movants' Claims Against Live Nation ("Underlying Action") ............5

    B.    Procedural History of Underlying Action............................................7

    C.    Movants Serve WME With Subpoena...................................................9

    D.    WME's Objections ............................................................................10

        1.    WME's Initial Objections In Response to Subpoena.................10

        2.    Movants Reasonably Attempt to Narrow the Scope of
            the Subpoena.............................................................................11

    E.    The Parties Met and Conferred As Required By The Court...............12

WME'S STATEMENT OF FACTUAL BACKGROUND .............................13

    A.    WME and the Personal Appearance Business.....................................13

    B.    Trade Secrets and Other Highly Confidential
        Commercial Information ....................................................................13

    C.    The Above-Captioned Action ............................................................14

    D.    Plaintiffs' Representations Regarding the Scope of Discovery
        In The Underlying Action...................................................................14

    E.    The "Meet And Confer" Process Between Plaintiffs and WME..........15

    F.    The Burden Imposed on WME by the Subpoena................................16

        1.    WME's Physical Records.........................................................17

        2.    WME's ESI...............................................................................17

ISSUES IN DISPUTE................................................................................19

# <u>TABLE OF CONTENTS</u>

**Page**

MOVANTS' POSITION ...................................................................19

WME MUST PRODUCE RESPONSIVE DOCUMENTS UNDER
THE SUBPOENA BECAUSE THEY ARE RELEVANT AND
NECESSARY TO MOVANTS' CLAIMS AGAINST LIVE NATION ..........19

    A.    The Subpoena Seeks Highly Probative Information ...........................19

    B.    WME's Objections to Providing This Highly Relevant
          Discovery Are Without Basis.................................................24

          1.    WME's General Objections Have Not Been Preserved.............24

          2.    WME Is Not Entitled To Withhold Discovery Responses
                Until Movants Exhaust Discovery With Live Nation ...............25

    C.    A Confidentiality Order Has Been Entered That Adequately
          Protects WME's Confidential And Proprietary Business
          Information And Any Other Third Party's Confidential
          Information ......................................................................27

    D.    WME Must Produce Documents Despite Its Self-Created Inability
          To Comply Because Of Undue Burden And Expense ......................28

WME'S POSITION IN OPPOSITION ..........................................30

    A.    The Subpoena Imposes An Undue Burden On WME......................32

          1.    The Subpoena Encompasses Large Amounts Of
                Irrelevant Documents.................................................32

          2.    Plaintiffs Do Not Need The Documents Described In
                The Subpoena ............................................................34

          3.    The Subpoena Lacks Specificity .................................35

          4.    The Subpoena Imposes A Heavy Burden On WME.................35

1

# **<u>TABLE OF CONTENTS</u>**

2

**Page**

3

B.      The Court Should Quash The Subpoena Because It Commands
        Production Of Highly Sensitive Commercial and Trade
        Secret Information ...................................................................36

C.      The Court Should Alternatively Shift The Burden Of
        Discovery To Plaintiffs ...........................................................37

SPECIFIC REQUESTS, WME'S RESPONSES, MOVANTS'
ARGUMENTS IN SUPPORT OF, AND WME'S ARGUMENTS
AGAINST, PRODUCTION.......................................................................37

MOVANTS' CONCLUSION ...................................................................62

WME'S CONCLUSION ..........................................................................62

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### JOINT STIPULATION REGARDING
### PLAINTIFFS' MOTION TO COMPEL

Pursuant to Federal Rule of Civil Procedure 37(a) and Local Rule 37-2.1, Movants, It's My Party, Inc. ("I.M.P.") and It's My Amphitheatre, Inc. ("I.M.A.") (collectively, "Plaintiffs" or "Movants"), and William Morris Endeavor Entertainment, LLC ("WME"), submit the following Joint Stipulation Regarding Plaintiffs' Motion to Compel compliance with a subpoena *duces tecum* in the above-captioned matter pending in the United States District Court for the District of Maryland.  This motion is filed in this Court in accordance with Federal Rule of Civil Procedure 37, which provides that a motion for an order compelling discovery from a non-party "must be made in the court where the discovery is or will be taken."  Pursuant to Local Rule 37-1, the parties conducted a pre-filing conference of counsel telephonically on January 6, 2010 and via written correspondence dated January 20, 2010 and February 17, 2010.  Pursuant to Local Rule 37-2.1, copies of the Court's Order establishing the initial case schedule in the action pending in the United States District Court for the District of Maryland, Northern Division, between Movants and Live Nation, Inc. ("Live Nation") as well as copies of all amendments thereto are attached to the Declaration of Rachel H. Robbins in Support of Plaintiffs' Motion to Compel ("Robbins Decl."), at Exhibits "D" and "F" respectively.

### MOVANTS' INTRODUCTORY STATEMENT

The documents demanded in the subpoena *duces tecum* served upon WME are critical to Movants' claims.  Central claims in the Plaintiffs' antitrust Complaint against Live Nation are that Live Nation offers supra-competitive fees to artists (often exceeding the entire concert gross) to induce music artists to participate in Live Nation promoted national, block-booked or multi-appearance concert tours provided that the artist agrees to appear at venues that Live Nation owns, leases, manages or

with which it has a booking agreement (other than for regions in which it does not have such a relationship with a venue).  Movants further allege that Live Nation conditions appearances at venues in regions where it holds a monopoly on the music venues upon artists agreeing also to appear at venues in areas where it faces competition.  As the booking agent for its client-artists' live concert appearances, including for national tours promoted by Live Nation, WME is in a unique position to provide evidence relevant to these claims.  Indeed, Movants served this subpoena, in part, because a WME agent, Mark Geiger, advised them while negotiating an appearance by Nine Inch Nails that monetary concessions were made to Live Nation in order for the artist to play Merriweather Post Pavilion, an amphitheatre I.M.A. operates in Columbia, Maryland, rather than Live Nation's competing venue in Bristow, Virginia (a Washington D.C. suburb).

Even though WME plainly possesses highly relevant information, it served blanket objections and refused to produce **any** responsive documents.  It argues that Movants must first obtain documents from Live Nation and that it would be unduly burdensome to comply with the subpoena.  To the contrary, Movants are not required to delay third-party discovery until Live Nation produces all responsive documents, particularly in that its seeks documents from WME that, by definition, are unavailable from Live Nation.  As Movants primarily seek documents relating to the negotiation of concert performances over a four year time period, compliance should not be unduly cumbersome.  Movants have also agreed to narrow the scope of the subpoena to address whatever issues WME could possibly have in locating and producing the requested documents and even offered to provide WME with specific search terms to limit its electronic data search.

Plaintiffs' Motion to Compel should accordingly be granted.

JOINT STIPULATION RE MOTION TO COMPEL WME TO PRODUCE DOCUMENTS
U.S.D.C. Case No.:  1:09-cv-00547-JFM

## **WME'S INTRODUCTORY STATEMENT IN OPPOSITION**

By this lawsuit pending in Maryland, plaintiffs It's My Party ("IMP") and It's My Amphitheatre, Inc. ("IMA") (collectively "Plaintiffs") contend that defendant Live Nation, Inc. ("Live Nation") unfairly competes for live musical performances in the Baltimore/Virginia area.  Plaintiffs are a Maryland-based promoter and the manager of the Merriweather Post Pavilion ("Merriweather"), an outdoor amphitheatre located in Columbia, Maryland.  According to the complaint, Merriweather used to be a premier venue but in recent years has suffered a dramatic decline.  Plaintiffs attribute the decline to Live Nation's conduct in promoting performances at its Jiffy Lube Amphitheatre, formerly known as the Nissan Pavilion ("Nissan") located 68 miles away in Bristow, Virginia which plaintiff alleges competes with Merriweather "[t]o some extent."  Plaintiffs contend that Live Nation used its monopoly power to coerce artists to perform at Nissan to the exclusion of Merriweather.  When stripped of hyperbole and speculation, Plaintiffs' complaint contains only one alleged specific instance involving the decision of the musical act the Jonas Brothers to play Nissan but not Merriweather in 2008.

In an attempt to prove their claims, plaintiffs served a expansive subpoena on non-party William Morris Endeavor Entertainment, LLC ("WME").  WME is one of the premier talent agencies in the world.  WME's Personal Appearance Department is one of the largest of its kind, operating out of three offices across the United States and one in London, England and responsible for booking live engagements for its large array of clients all over the world.  At the time the subpoena was served, WME represented approximately 500 clients – but not the Jonas Brothers -- and booked more than 30,000 engagements per year.  Rather than confining their subpoena to negotiations on behalf of WME clients who appeared at Nissan and not Merriweather over a limited time period, Plaintiffs' subpoena contained 15 egregiously overly broad

requests which would require WME to produce nearly every document (electronic and/or hard copy) from its Personal Appearance Department from 2006 to the present. According to the consultant WME was forced to engage, the costs related to the electronically stored information alone would cost more than $3,000,000.

Plaintiffs served the Subpoena in November 2009 and WME timely served objections.  Thereafter, Plaintiffs and WME met and conferred but what occurred during those discussions is mischaracterized by Plaintiffs.  WME's counsel explained the incredible burden the Subpoena would place upon WME based upon the breadth of the requests and considering how WME maintained its hardcopy and electronically stored documents.  WME's counsel further pointed out that the Subpoena was particularly unfair since Plaintiffs had not sought these documents from defendant Live Nation.  In response, Plaintiffs only offered to limit the requests to 29 specific WME clients and "the details regarding the negotiations leading up to all national, blocked booked and/or multi-appearance touring agreements" between the 29 clients and Live Nation from January 1, 2006 through the present.  On February 17, 2010, counsel for WME sent a letter to Plaintiffs' counsel explaining in some detail why these limitations would not materially lessen the burden on WME.  WME's counsel proposed that Plaintiffs withdraw their Subpoena, focus their discovery efforts on Live Nation, and then if they still required documents from WME, "serve a more narrowly tailored subpoena at that time."

Plaintiffs never responded to that letter.  However, it appears from the court record that Plaintiffs did thereafter pursue discovery from Live Nation.  On August 25, 2009, in response to a similar dispute with Live Nation, counsel for Plaintiffs submitted a letter brief to the court in the Maryland Action limiting its discovery to "(i) an identification of all national or multi-appearance tours of artists Live Nation promoted in 2006 through 2009 concert seasons; (ii) a tour schedule for each such

artist for those concert seasons; and (iii) an identification of all amphitheatres or other such venues Live Nation owns, operates or at which it has exclusive booking rights." Thereafter, Plaintiffs represented they would only seek "relatively confined" additional information regarding such tours. The same limitations were never offered to WME, however. Instead, Plaintiffs waited until August 19, 2010 -- six months after WME's counsel's letter -- to initiate the instant motion to compel which does not contain the same limitations offered to Live Nation or even the much less meaningful limitations offered to WME during the meet and confer process. Plaintiffs' argument that it needs all of the documents now because they have not completed their discovery from Live Nation and are facing a fast-approaching discovery cut-off November 30, 2010 is entirely unavailing.

For these reasons, WME asks the Court to deny Plaintiffs' motion to compel in its entirety. Plaintiffs should be forced to complete their discovery with Live Nation and then, if necessary, serve a more reasonable subpoena which targets the engagements having some bearing on its claims of anti-competitive conduct in the Baltimore area. If WME is compelled to provide any documents in response to the Subpoena, those costs should be borne by Plaintiffs.

## MOVANTS' STATEMENT OF FACTUAL BACKGROUND

### A.    Movants' Claims Against Live Nation ("Underlying Action")

Over the last decade, Live Nation has, by its own admission, sought to gain control over the entire interface between major popular music artists and their fans. It first acquired monopoly power in the national market for promoting live popular music concerts by major artists by, *inter alia*, acquiring local or regional promotional firms, and (while owned by Clear Channel Communications) refusing to provide radio airplay to artists, and to advertise concerts, promoted by rivals. Live Nation sought to expand its market power to the market for providing venue services to artists. It

acquired, leased and/or entered into management or exclusive booking arrangements with numerous music concert venues throughout the United States.  At the present time, Live Nation controls through ownership, lease, management agreement or exclusive booking arrangement at least 111 music venues nationwide, including 40 out of the 48 amphitheatres in the country with a seating capacity that exceeds 15,000, and the only, or a monopoly of, amphitheatres in 18 of the 25 largest markets in the country.

As Live Nation expanded its national footprint, Live Nation made offers to popular music artists to promote their tours on a national, block-booked or multi-appearance basis.  To induce the artist to participate in national tour deals, Live Nation offered supra competitive performance fees, including fees exceeding the entire amount the concert tour was expected to earn through ticket sales.  Live Nation will only promote an artist on a national, block-booked or multi-appearance basis if the artist only appears at the venues it controls.  It does so to consolidate its control of venues throughout the country.  It also requires that artists appear at venues it controls in order to receive the parking fees, concession fees and other ancillary revenue generated at the concert venue in order to offset the losses it incurs in promoting the concert.  Once it gained market power in the market for providing venue services to artists, Live Nation began requiring artists to appear at venues in geographic markets where it faces competition from a similarly situated venue in order to appear at venues in areas where it controls the only or a monopoly of facilities utilized for music concerts.

Plaintiffs have been adversely affected by this conduct.  I.M.P is the vehicle through which Seth Hurwitz, a noted promoter in the Washington, D.C. and Baltimore areas, promotes concerts.  Mr. Hurwitz has promoted countless major popular music

artists, including Nickelback, Gwen Stefani, Nine Inch Nails, Maroon 5, Counting Crows and Coldplay, often establishing a relationship with the artist early in their careers.  Mr. Hurwitz also operates I.M.A., which manages the Merriweather Post Pavilion ("Merriweather").  Merriweather is located about sixty-eight miles from Live Nation's Jiffy Lube Live Amphitheatre (formerly, "Nissan Pavilion") (hereinafter, "Jiffy Lube Live" or "Nissan") and competes with it in the Baltimore/Washington D.C. metropolitan areas.  Live Nation's tying artists' use of its promotional services to their appearing at Live Nation controlled venues and using its control over venues in an area of the country in which it operates the only or a monopoly of the available music venues to coerce artists to appear at other venues where it faces competition has denied I.M.P. and I.M.A. the ability to compete for artists and, therefore, fans.  Movants have been precluded from fairly competing for artists, and many artists who previously utilized I.M.P.'s promotional services and/or who appeared at Merriweather, no longer do so.

### B.   Procedural History of Underlying Action

Movants filed a Complaint against Live Nation on March 5, 2009 in the United States District Court for the District of Maryland.  (*Robbins Decl.*, ¶ 1 and Ex. A attached thereto.)  Movants allege that Live Nation's leveraging its monopoly power in concert promotion to coerce artists to appear at venues it controls constitutes a tying arrangement that is per se unlawful (Count I) or unlawful under the rule of reason (Count II) under Section 1 of the Sherman Act.  (Id.)  Movants also claim that Live Nation has violated Section 2 of the Sherman Act by:  (i) acquiring competitors; (ii) refusing to negotiate the scope of national tour deals; (iii) leveraging its power in the market for the promotion of concerts to acquire market power in the market for providing venue services to artists; (iv) leveraging its monopoly over venues in one area or region to force artists to appear at venues in markets where Live Nation faces

competition and to deny I.M.P. and I.M.A. access to critical input (Count III).  (Id.) They furthermore assert causes of action for attempting to monopolize the Baltimore market for hosting popular music concerts (Count IV), monopolization of the national market for promoting popular music concerts (Count V), monopolization (Count VI) and attempted monopolization (Count VII) of critical input, violating the Maryland Antitrust Act (Count VIII), and interference with contract (Count X) and unfair competition under Maryland tort law (Count XI).  (Id.)

Live Nation filed a Motion to Dismiss the Complaint on April 27, 2009. (*Robbins Decl.*, ¶ 2.)  It contended, among others, that Movants had not pled specific facts sufficient to establish unlawful conduct and antitrust injury.  Live Nation further argued that Movants had not alleged damages because they did not identify any specific artists other than the Jonas Brothers who were prevented from utilizing their services as a result of its conduct.  This Motion was denied by Order filed on July 17, 2009.  (*Robbins Decl.*, ¶ 2 and Ex. B attached thereto.)  The Court did not issue a formal opinion and, instead held in a memorandum decision that Movants had "alleged sufficient facts to withstand the motion to dismiss even under the more stringent pleading requirements imposed by Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) and Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009)."  (Ex. B to *Robbins Decl.*) Live Nation filed its Answer and Affirmative Defenses on July 31, 2009.  (*Robbins Decl.*, ¶ 3 and Ex. C attached thereto.)

The original case scheduling order provided for discovery to be completed by March 15, 2010.  (*Robbins Decl.*, ¶ 4 and Ex. D attached thereto.)  On January 26, 2010, the Court entered an Order approving a stipulated Motion for an Extension of the Discovery Period, which extended discovery until November 30, 2010.  (*Robbins Decl.*, ¶ 5 and Exs. E and F attached thereto.)  Discovery was extended primarily because Live Nation would not be able to complete its document production until June

2010 because of issues with its electronic data storage system.  (*Robbins Decl.*, ¶ 6
and Ex. E attached thereto.)

### C.   Movants Serve WME With Subpoena

Movants served WME with a Federal Rule of Civil Procedure 45 subpoena
*duces tecum* on November 11, 2009 (hereinafter, the "Subpoena").  (*Robbins Decl.*,
¶ 7 and Ex. G attached thereto.)  WME is a talent agency with a personal appearance
department that represents music artists.  (*Robbins Decl.*, ¶ 8 and Ex. H attached
thereto.)  Its services include acting as a booking agent for its client-artists'
appearances in venues across the country and throughout the world.  (Id.)  Movants
served similar subpoenas upon numerous other booking agencies.[1]  (*Robbins Decl.*,
¶ 11.)

The Subpoena seeks fifteen categories of documents.  (See Ex. G to *Robbins
Decl.*)  Notably, it requires the production of "each and every document
memorializing, generated during, reporting upon or otherwise relating to the
negotiation of any contract, agreement or understanding for Live Nation to promote,
produce or sponsor on a tour, block-booked or multi-appearance basis" any of WME's
clients.  This request includes communications between WME and its clients, as well
as between WME and Live Nation.  With two exceptions, the applicable time period
covered is from January 1, 2006 to the present.  (Id., at Instr. No. 6.)  Of significance
here, the Subpoena seeks documents memorializing the negotiation of any and all
appearances of WME's client-artists at Nissan Pavilion from the 2003 concert season
through the 2009 concert season.[2]  (Id., at Request Nos. 7 and 8.)

---

[1] Movants served subpoenas upon The M.O.B. Agency, Creative Artists Agency,
Paradigm Talent Agency, Variety Artists International, Inc., The Agency Group,
Mann Music Center, and Rebel Waltz.
[2] The Subpoena defines "Season" as "the amphitheatre concert season that runs
approximately from the spring through fall."  (Ex. G to *Robbins Decl.*, at Def. No. 11).

D.   **WME's Objections**

1.   **WME's Initial Objections In Response to Subpoena**

WME made no attempt to respond meaningfully to the Subpoena, but rather served written Objections and refused to produce any documents whatsoever. (*Robbins Decl.*, ¶ 15 and Ex. K attached thereto.)  In eleven general boilerplate objections, WME claimed that Movants could not seek third party discovery until pursuing discovery against Live Nation (Ex. K to *Robbins Decl.*," at General Objection No. 2.), that every instruction, definition or request and each and all of the categories contained in the Subpoena are "unreasonably vague, broad, repetitious, unduly burdensome, and oppressive or otherwise lack sufficient precision or particularity to permit response" and unreasonably broad as to time (id., at Nos. 4 and 11), that the Subpoena "purports to require the production of information, including electronically stored information, beyond the scope of permissible discovery under the Federal Rules of Civil Procedure and the Local Rules of the United States District Court for the Central District of California" (id., at Nos. 5, 7 and 11), and the Subpoena seeks information that "is protected from discovery by the attorney-client privilege, work product immunity, or any other applicable privilege or protection, or are otherwise immune or protected from disclosure" (id., at General Objection No. 8).

WME also asserted virtually identical objections to each specific document request, claiming, for example, that:

> [I]t is overbroad and unduly burdensome in that it seeks far-reaching discovery from a third-party without first exhausting efforts to obtain such information from party witnesses in violation of Federal Rules of Civil Procedure 45. Given that Plaintiffs' Complaint states specific facts relating to but one venue (Merriweather) and one artist (The Jonas Brothers), the Request is also overbroad in that it requests production of documents relating to artists, deals and venues not specifically at issue in Plaintiffs' Complaint and is, in substance, an impermissible "fishing expedition" by Plaintiffs. The Request is also overbroad in that it purportedly includes, among other things, every document

generated during a nearly 4-year period. WME further objects in that the Request seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. WME further objects to the extent it seeks confidential and proprietary information, trade secrets, including confidential information belonging to third parties, including all of WME's clients, and/or other information protected from disclosure by WME's agreements or duties to other third-parties.

(Id.)

### 2.    Movants Reasonably Attempt to Narrow the Scope of the Subpoena

After receiving WME's Objections, counsel for Movants attempted to negotiate voluntary compliance.  After several scheduling attempts by Movants' counsel, the parties conducted a Rule 37 conference telephonically on January 6, 2010 and via written correspondence dated January 20, 2010 and February 17, 2010.  (*Robbins Decl.*, ¶ 18.)  During the January 6, 2010 teleconference, WME's did not seriously dispute the relevancy of the requested information, but rather demanded that Movants first exhaust discovery of Live Nation and complained that it would be burdensome to respond to the Subpoena.  (Id.)  Movants responded that the Subpoena was limited in scope because it focused upon the negotiation and contractual arrangements for artists to appear in Live Nation promoted national, block-booked or multi-appearance tours. (Id.)  As Live Nation only enters into these types of promotional arrangements with popular artists, there is only a limited number of artists to which the Subpoena applied.[3]  (Id.)  Movants also noted that the Subpoena included requests for documents that would not likely be in the possession of Live Nation.  (Id.)  WME still refused to produce any documents whatsoever.  (Id.)

---

[3] The group of artists who have sufficient popularity to appear at amphitheatres and entered into national, block-booked and/or multi-appearance touring agreements with Live Nation is relatively small compared to the overall number of artists with whom WME does business.  (Ex. A to *Robbins Decl.*, at ¶¶ 47 and 53.)

Movants' counsel attempted to address any issues with the Subpoena through a written proposal to limit the scope of the Subpoena to 29 specific artists:

(1) Nine Inch Nails; (2) John Mayer; (3) Rascall Flatts; (4) Brad Paisley; (5) Eminem; (6) Lil' Wayne; (7) Kayne West; (8) Tom Petty; (9) Roger Waters; (10) Cinderella; (11) Godsmack; (12) Goo Goo Dolls; (13) Journey; (14) Lynyrd Skynyrd; (15) Mary J. Blige; (16) Sheryl Crow; (17) Alan Jackson; (18) Brooks & Dunn; (19) Snoop Dog; (20) Jane's Addiction; (21) The Killers; (22) Pearl Jam; (23) The Eagles; (24) Alicia Keys; (25) Eddie Vedder; (26) Van Halen; (27) Josh Groban; (28) Ozzy Osbourne; and (29) Maxwell.

(*Robbins Decl.*, ¶ 19 and Ex. M attached thereto.)  WME replied that nothing short of withdrawing the Subpoena would assuage its concerns.  (*Robbins Decl.*, ¶ 23 and Ex. P, at p. 3, attached thereto.)

**E.      The Parties Met and Conferred As Required By The Court**

Counsel for WME and Movants met and conferred via teleconference on January 6, 2010, and again via e-mail correspondence and letter on January 20, 2010 and February 17, 2010, respectively.  As WME refused to move from its position that it would produce no documents whatsoever, no compromise was possible. Nevertheless, Movants did not immediately move to compel.  Rather, even though they believed they were not required to do so, Movants attempted to complete discovery against Live Nation in an attempt to moot WME's argument that they should complete party discovery before pursuing third-party discovery.  This has not proved possible because Live Nation has yet to complete its production of electronic discovery.  It will simply not be possible to further delay obtaining discovery from WME, and yet complete discovery by the November 30, 2010 discovery cut-off.

Movants accordingly move to compel compliance with the Subpoena.  In an effort to limit the issues in dispute, Movants have limited this Motion to Requests 1, 2, 5-9, 12 and 15.

## WME'S STATEMENT OF FACTUAL BACKGROUND

WME supplements Plaintiffs' Statement of Factual and Procedural Background as follows.

### A.   WME and the Personal Appearance Business

WME is a well-known talent agency principally located in Beverly Hills, California, and represents the interests of artists throughout a variety of industries, including motion pictures, television, music, theatre, publishing, commercials, sports, digital media, and video games.  See Declaration of Thomas B. McGuire, Jr. ("McGuire Decl."), ¶ 2.  WME's Personal Appearance Department specializes in negotiating and arranging personal appearances, such as concerts, on behalf of clients including singers, musicians, comedians and lecturers.  See McGuire Decl. ¶ 3.  Booking agents within WME's Personal Appearance Department are responsible for making all of the arrangements for the personal appearances of the artists they represent.  In addition to negotiations regarding the venue for each artist's personal appearance, WME's booking agents often negotiate all the particulars of an artist's appearance with the venue and promoter.  See McGuire Decl. ¶ 5.

The Personal Appearances business is highly competitive, and WME booking agents rely upon their relationships with promoters, concert buyers and venues and their experience and knowledge of specific regional markets and artistic genres to negotiate favorable terms on behalf of their clients.  See McGuire Decl. ¶ 6.

### B.   Trade Secrets and Other Highly Confidential Commercial Information

Given the interests of its clients and the competitive nature of the concert booking business, WME has taken care not to release certain information related to the business of its clients and, more generally, of WME's Personal Appearances

Department.  See McGuire Decl. ¶¶ 6-7.  Such information includes sensitive financial information of WME and its clients, the terms of appearance contracts negotiated by WME on behalf of its various clients, and trade secret lists of WME's contacts throughout the various regions in which WME operates.  See McGuire Decl. ¶¶ 6-7.  Especially where WME has entered into non-disclosure and confidentiality agreements regarding the details of its negotiations, WME is not at liberty to disclose any protected information, even subject to a protective order.  See McGuire Decl. ¶¶ 6-7.  Moreover, a protective order would not adequately protect WME from the disclosure of its trade secrets to Plaintiffs and Live Nation, who negotiate across-the-table from WME and its clients, and who stand to gain a competitive advantage from the highly confidential commercial information in the parties' future business dealings.  See McGuire Decl. ¶¶ 6-7.

### C.   The Above-Captioned Action

The allegations in Plaintiffs' Complaint consist largely of legal conclusions regarding Live Nation's conduct within the Baltimore and national markets (despite the fact that Plaintiffs operate only in the Baltimore area).  See Robbins Decl., Ex. A.  Indeed, the only factual allegation in Plaintiffs' Complaint regarding a specific instance wherein Defendant allegedly caused harm to Plaintiffs appears in Paragraph 124 of the Complaint, wherein Plaintiffs allege that in 2008, Defendant demanded that the Jonas Brothers play at 1st Mariner Arena instead of at Merriweather.  See Robbins Decl., Ex. A.  WME has never represented the Jonas Brothers in any capacity and was not, otherwise, involved in the Jonas Brothers' 2008 appearance at 1st Mariner Arena.

### D.   Plaintiffs' Representations Regarding the Scope of Discovery In The Underlying Action

Pursuant to the local rules of the District Court in Maryland, Plaintiffs and Live Nation "met and conferred" in August and September 2009, in order to determine an

appropriate scope for discovery in the above-captioned action.  <u>See</u> Declaration of Justin J. Lowe ("Lowe Decl."), Ex. A.  In response to Live Nation's concerns that Plaintiffs intended to conduct a "fishing expedition through all of Live Nation's documents in all geographic regions in order to see if there is an anticompetitive pattern or practice," Plaintiffs assured the Court that their discovery would be "relatively confined," and that they were seeking "only three discrete pieces of information."  <u>See</u> Lowe Decl., Ex. A.  Plaintiffs summarized the information they intended to seek in discovery as follows: "(i) an identification of all national or multi-appearance tours of artists Live Nation promoted in the 2006 through 2009 concert seasons; (ii) a tour schedule for each such artist for those concert seasons; and (iii) an identification of all amphitheatres or other such venues Live Nation owns, operates or at which it has exclusive booking rights."  <u>See</u> Lowe Decl., Ex. A.

The discrete discovery plan, as expressed by Plaintiffs, is significant in several respects.  First, Plaintiffs represented to the Court that they are not seeking detailed records reflecting negotiations, communications or contracts from Live Nation or any other party.  Second, Plaintiffs represented that they needed only discovery relating to the last three concert seasons.  As set forth below, Plaintiffs Subpoena to WME, a non-party, is considerably broader and more intrusive than the categories described above and, essentially, imposes an even greater discovery burden on WME than Live Nation.

### E.    The "Meet And Confer" Process Between Plaintiffs and WME

While Plaintiffs and WME "met and conferred" regarding the scope of the Subpoena in early 2010, Plaintiffs significantly overstate the degree to which they offered to compromise their position or limit the Subpoena.  As evidenced by the correspondence exchanged by counsel for Plaintiffs and WME, Plaintiffs offered only illusory "limitations" and failed to effectively address any of WME's legitimate

concerns.  Lowe Decl. ¶ 3.  While Plaintiffs narrowed their demand to encompass only documents pertaining to 29 WME clients, Plaintiffs expressly reserved the right to later enlarge the scope of the Subpoena to any of WME's clients.  See Robbins Decl., Ex. M.  ("However, please be advised that by narrowing the Subpoena to the above-identified artists, Plaintiffs do not waive, and specifically reserve, their right to request information concerning any additional WMEE artists who are identified during the course of discovery in this matter.")  Likewise, when apprised of the reasons why responding to the Subpoena would be unduly time consuming and difficult, Plaintiffs responded with disbelief and stubbornly insisted upon aggressively pursuing their discovery agenda against WME.  See Lowe Decl. ¶ 3; Robbins Decl., Ex. M.

Significantly, Plaintiffs never responded to a February 17, 2010 letter from counsel for WME further describing the excessive burden imposed by the Subpoena. See Lowe Decl. ¶ 3.  Instead, apparently persuaded of the validity of WME's position, Plaintiffs purportedly sought discovery from Live Nation.  Nevertheless, after six months had elapsed, Plaintiffs provided notice of the instant Motion to Compel on August 19, 2010.

## F.   The Burden Imposed on WME by the Subpoena

The Subpoena encompasses both the physical records and electronically stored information ("ESI") generated by WME's Personal Appearances Department.  Thus, in order to respond to the Subpoena, WME's Personal Appearances Department would need to engage in a comprehensive search of its physical records and ESI over a six year period.  The process by which WME would conduct a search of its physical files is significantly different from the way it would search its ESI.  Both search processes are described below.

### 1.   **WME's Physical Records**

WME maintains a separate physical file for each personal appearance negotiated on behalf of its clients.  See McGuire Decl. ¶ 8.  During the relevant time frame, WME brokered approximately 30,000 appearances each year on behalf of its clients.  See McGuire Decl. ¶ 3.  As a result of the manner in which WME stores its Personal Appearance Department records, there is no convenient way to limit its retrieval of documents called for by the Subpoena.  The documents are not stored according to a specific venue, specific region, specific artist, or specific date range, or by "national, block-booked or multi-appearance concert tours."  See McGuire Decl. ¶ 10.  Nevertheless, even if WME is able to identify the "block booked" and "multiple appearance" engagements, WME would need to retrieve each physical file from its respective storage location.  See McGuire Decl. ¶¶ 9-11.  While the Personal Appearances Department maintains up to six months of physical files on hand in each of its offices, the vast majority of physical records described in the Subpoena have been sent by WME to long term document storage with an off-site document management company.  See McGuire Decl. ¶¶ 9-11.  Upon retrieving the physical files, WME would need to electronically scan each file in order to produce its physical documents alongside its ESI.  See McGuire Decl. ¶ 11.

### 2.   **WME's ESI**

After conducting a preliminary investigation of WME's information technology systems, WME estimates that responding to the Subpoena, even after accounting for Plaintiffs' limitations, will require WME to comb through terabytes of data spread across numerous computer servers and hundreds of individual work stations physically located at four WME offices in different cities around the United States.  See Declaration of Vahik Gharibian ("Gharibian Decl.") ¶¶ 2-5.  the Subpoena incorporates not only live and archived data, but also backup data stored on difficult to

access tape media regarding over 160 WME personnel ("Custodians")[4].  McGuire Decl. ¶ 4; Gharibian Decl. ¶ 7.  Likewise, because WME is the successor in interest to William Morris Agency and Endeavor Entertainment which agencies merged in 2009, the Subpoena requires a comprehensive search of six separate systems of electronic data – the legacy email and file server systems of William Morris Agency and Endeavor Entertainment for pre-merger data, and the email and file server system of WME for post-merger data.  *See* Gharibian Decl. ¶¶ 2-8.

The amount of electronically stored email and document data that would need to be collected, processed and searched for responsive documents is tremendous.  Just with respect to searching and collecting data from WME's live and archived servers, a third-party ESI specialist estimates that it will need to collect approximately 830 gigabytes of data (5 gigabytes for each of the 166 Custodians) from WME office locations in Los Angeles, New York, Miami and Nashville, and that mere collection of the data will require nearly two months.  Under Lowe Decl., ¶ 5, Ex. B.  After collecting the data, the ESI specialist would eliminate duplicates, prepare document review databases and process the documents for review.  The total cost for mere data collection (forensics), electronic file processing and production, early case assessment and the creation and hosting of a document review database will exceed $1 million. Under Lowe Decl., ¶ 5, Ex. B.

After the initial collection and processing of data, WME will need to review the documents for responsiveness, privilege and confidentiality.  Given the nature of WME's communications with its clients, many documents contain commercially

---

[4] The number of Custodians is a conservative estimate.  It represents the number of Representing Agents, Booking Agents and assistants for each of the 29 clients identified by Plaintiffs.  The number does not include other WME personnel and staff who may have performed limited work in relation to multiple or block-booked appearances of WME's clients.  Although the Subpoena encompasses such individuals, including them in the calculation would exponentially increase the number of Custodians involved in the search.

sensitive but, otherwise, irrelevant information that WME will need to redact prior to production.  See Lowe Decl. ¶ 6.  Additionally, given the provisions of the Stipulated Protective Order, WME would need to evaluate whether the responsive documents should be stamped "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL" pursuant to the terms of the Order.  See Lowe Decl. ¶ 6.  Even assuming a generous 70% cull rate, WME would need to review over 199 gigabytes of data (approximately 1,992,000 documents), which would require in excess of 43,160 hours assuming a review rate of 60 documents per hour.  See Lowe Decl. ¶¶ 6-7, Ex. B.  Thus, if WME elects to utilize the document review services of the third-party ESI consultant at $60 per hour, the document review alone would cost in excess of $2.5 million.  See Lowe Decl. ¶¶ 6-7, Ex. B.  If WME utilized outside counsel to perform the review at $300 per hour, the cost of the review would increase five-fold to $12.5 million.  See Lowe Decl. ¶¶ 6-7, Ex. B.

## ISSUES IN DISPUTE

Should This Court Compel WME to Comply with Movants' Requests for Production of Documents in Accordance with the Subpoena?

## MOVANTS' POSITION

### WME MUST PRODUCE RESPONSIVE DOCUMENTS UNDER THE SUBPOENA BECAUSE THEY ARE RELEVANT AND NECESSARY TO MOVANTS' CLAIMS AGAINST LIVE NATION

**A.** **The Subpoena Seeks Highly Probative Information**

Rule 26 establishes one standard for assessing the scope of discovery for both parties and non-parties.  Gonzales v. Google, Inc., 234 F.R.D. 674, 679 (N.D. Cal. 2006).

> Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense . . . [r]elevant information need not be admissible at trial if the

JOINT STIPULATION RE MOTION TO COMPEL WME TO PRODUCE DOCUMENTS
U.S.D.C. Case No.:  1:09-cv-00547-JFM

19

> discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  The requesting party has the burden to prove relevancy, but only if the relevancy of the information sought is not self-evident.  Tequila Centinela v. Bacardi & Co. Ltd., 242 F.R.D. 1, 9 (D.D.C. 2007).  Further:

> A district court whose only connection with a case is supervision of discovery ancillary to an action in another district should be especially hesitant to pass judgment on what constitutes relevant evidence thereunder.  Where relevance is in doubt . . . the court should be permissive.

Compaq, supra, 163 F.R.D. at 335 (quoting Truswal Sys. Corp. v. Hydro-Air Eng'r, Inc., 813 F.2d 1207, 1211-12 (Fed. Cir. 1987)); see also In re Honeywell Int'l, Inc. Sec. Litig., 230 F.R.D. 293, 301 (S.D.N.Y. 2003).

As WME objects to the entire Subpoena, Movants will generally address the relevance of the documents sought therein.  An element of a tying claim is proof of an "an agreement conditioning the purchase of the tying service upon purchase of the tied service (or at least upon an agreement not to purchase the tied service from another party)" Jefferson Parish Hospital District No. 2 et al. v. Hyde, 466 U.S. 2, 12-16 (1984); HCI Technologies, Inc. v. Avaya, Inc., 241 Fed.Appx. 115, 122 (4th Cir. 2007).[5]  To satisfy this element of their claims, Movants allege that, in promoting national, block-booked or multi-appearance tours, Live Nation only offers the artist the opportunity to appear at Live Nation controlled venues.  It also often will not allow an artist to appear at a venue in geographic locations in which it controls a monopoly of the venues or the most prestigious venue in a geographic area upon the artist also appearing at venues it controls in areas where it faces competition.

---

[5] Fourth Circuit law is controlling in the underlying action, and thus, Fourth Circuit authorities are "most pointed" as to what is relevant on Movants' Sherman Act claims. See Compaq, 163 F.R.D. at 336 n.17.

These allegations also support Movants' monopoly and attempted monopoly claims because they show abuse of Live Nation's market power, <u>Verizon Commc'ns Inc. v. Law Offices of Curtis & Trinko</u>, 540 U.S. 398, 407 (2004) (willful maintenance of a monopoly is unlawful), and leveraging claims, <u>United States v. Griffith</u>, 334 U.S. 100, 107 (1948) ("it is unlawful for operator of circuit of motion picture theaters to use his monopoly in towns in which he has no competitors to obtain exclusive rights to films for towns in which he has competitors.").  <u>See also</u> <u>Nobody In Particular Presents, Inc. v. Clear Channel Commc'ns, Inc.</u>, 311 F. Supp. 2d 1048 (D. Colo. 2004) (denying music promoters access to artists is exclusory conduct demonstrating willful acquisition or maintenance of monopoly power).

Additionally, a defendant may be held liable in tort even if its conduct does not violate the federal antitrust laws.  <u>Trimed, Inc. v. Sherwood Medical Co.</u>, 977 F.2d 885, 891 (4th Cir. 1992) (applying Maryland law).  Movants assert that, regardless of whether Live Nation's anticompetitive actions violate the antitrust laws, they exceed the scope of legitimate business conduct and constitutes unfair competition. <u>Baltimore Bedding Corp. v. Moses</u>, 182 Md. 229, 237 (Md. Ct. App. 1943) (defendant unfairly competes where it engages in conduct beyond what is considered legitimate in the community).  Plaintiffs also allege that Live Nation has engaged in wrongful conduct specifically directed at them, such as insisting that artists appear at other venues even if they are not appearing at a Live Nation controlled venue.

The means through which exercises its control over artists' choice of promoter and venue is negotiations with their booking agents, such as WME, as booking agents handle the negotiations for an artist's participation in a concert tour and Live Nation rarely communicates directly with the artist.  WME's records are therefore the best evidence of the conditions Live Nation imposes on the artists to participate in the tours it promotes.  Further, as WME undoubtedly communicates Live Nation's position to

its artist clients, its records are likely to demonstrate the artists' reaction to these demands and the extent to which they restrain competition. Jefferson Parish, supra, 466 U.S. at 14-15 and 29 (foreclosure exists where, *inter alia*, the arrangement insulates a potentially inferior product from competitive pressures and/or deprives consumers the freedom to select the best bargain). The artists' reaction to Live Nation's demands is particularly important because Live Nation claims that Movants must prove that artists would have used I.M.A.'s promotional services and/or appeared at Merriweather but for Live Nation's wrongful conduct. Although Movants dispute this assertion, this issue will not be resolved until after discovery closes and Movants are entitled to conduct discovery on the defenses Live Nation has asserted.

WME's assertions that Movants are on a "fishing expedition" or that they seek discovery as to the promotion of artists who are not even referenced in their Complaint are without foundation and mimic the arguments Live Nation raised in its failed Motion to Dismiss, which is not surprising given that the Co-CEO of WME also serves as a director of Live Nation. (Robbins Decl., ¶ 15, Ex. L attached thereto.) Plaintiffs filed a detailed, 203 paragraph Complaint against Live Nation. Those allegations were based, *inter alia*, upon disclosures in Live Nation's public filings, testimony under oath before the Antitrust Subcommittee of the Senate Judiciary Committee and independent investigation. As the Complaint survived a Motion to Dismiss, Movants are entitled to conduct discovery to obtain further support for the allegations made therein. It is a fundamental allegation of Movants' Complaint that, by inducing artists to agree to national tour, block-booked or multi-appearance promotional agreements with offers of supra competitive performance fees and conditioning the artists' participation in those tours upon the artists appearing in Live Nation controlled venues, amphitheatre operators, like I.M.A., have been denied the ability to compete for the kinds of artists they were constructed to service, and

promoters, like I.M.P., have been denied the ability to compete to promote concerts by artists of broad popularity.  The Subpoena is directed to obtaining information about artists appearing in Live Nation promoted national, block-booked or multi-appearance tours and, thus, is directly related to these fundamental allegations.

Further, contrary to WME's arguments, Movants identified many of these artists in the Complaint.  They specifically identified artists whose national tours Live Nation promoted during the 2007 and 2008 seasons, including the following WME artists subject to the Subpoena:  Nine Inch Nails, Rascall Flatts, Brad Paisley, Roger Waters, Brooks & Dunn and Pearl Jam.  (See Ex. A to *Robbins Decl.*, at ¶ 73.) Moreover, Movants alleged that five artists, including two WME clients, discontinued their relationship with them after Live Nation began its anticompetitive conduct:

> Major artists having a long standing relationship with I.M.P. and previously appearing at Merriweather, including Maroon 5, Nine Inch Nails, Counting Crows, Pearl Jam and Depeche Mode, ceased appearing at Merriweather and discontinued their relationship with I.M.P. after signing a tour deal with Live Nation because Live Nation forced them to utilize its promotional service and appear exclusively at Nissan.[6]

(Id., ¶ 126.)  A plaintiff is not required to prove its case in the Complaint and Plaintiffs did not identify (or know at the time the Complaint was filed) every artist who agreed to a national, multi-appearance or block-booked tour in the 2007 and 2008 seasons.  The Complaint was furthermore filed in March 2009 and, as such, Plaintiffs could not identify in the Complaint artists appearing on Live Nation promoted national, multi-appearance or block-booked tours in the 2009 season.  At this point, Movants believe the artists with respect to whom they seek discovery appeared on a Live Nation promoted national, block-booked or multi-appearance tour in one or more of the 2006 through 2009 seasons.

---

[6] Nine Inch Nails and Pearl Jam are WME's clients.

Moreover, as set forth in an email from WME, monetary concessions were paid to Live Nation for it to allow Nine Inch Nails ("NIN") to appear at Merriweather. (*Robbins Decl.*, ¶ 9 and Ex. I attached thereto.)  Compelling support for Movants' claims is found in a Trent Reznor (NINs' lead singer) website:

> NIN decides to tour this summer. We arrive at the conclusion outdoor amphitheaters are the right venue for this outing, for a variety of reasons we've thoroughly [sic] considered.  In the past, NIN would sell the shows in each market to local promoters, who then "buy" the show from us to sell to you. Live Nation happens to own all the amphitheaters and bought most of the local promoters - so if you want to play those venues, you're being promoted by Live Nation.

(*Robbins Decl.*, ¶ 10 and Ex. J attached thereto, footnote omitted.)

### B. WME's Objections to Providing This Highly Relevant Discovery Are Without Basis

#### 1. WME's General Objections Have Not Been Preserved

WME's refusal to produce what is clearly relevant information based upon its unsupported General Objections need not be addressed at length.   Fed. R. Civ. P. 45(d)(2)(A); Ramirez v. County of Los Angeles, 231 F.R.D. 407, 409 (C.D. Cal. 2005) (objections that subpoena is overly broad, vague, and unduly burdensome or oppressive without more specificity as to how each question is so are waived); Accord, Compaq Computer Corp. v. Packard Bell Elecs., Inc., 163 F.R.D. 329, 338 (N.D. Cal. 1995).  While a party serving a subpoena *duces tecum* "must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena," the responding party bears a heavy burden of proving that a subpoena is unduly burdensome.  In re Yassai, 225 B.R. 478 (C.D. Cal. 1998); Tequila Centinela, 242 F.R.D. at 10 (party subject to subpoena must demonstrate how it is "overly broad, burdensome, or oppressive, by submitting affidavits or offering evidence which reveals the nature of the burden").  WME has failed to satisfy this burden.

## 2.   WME Is Not Entitled To Withhold Discovery Responses Until Movants Exhaust Discovery With Live Nation

Movants are not required to first exhaust discovery with the defendant prior to seeking discovery from a non-party.  Olympic Refining Co. v. Carter, 332 F.2d 260, 266 (9th Cir. 1964) ("It is immaterial that [plaintiff] could possibly obtain the same information . . . [from defendants].  It is entitled to know what those companies and the alleged co-conspirators told the Government, and this requires examination of the documents which were exchanged . . . ."); Viacom Int'l, Inc. v. YouTube, Inc., No. Civ. A. 08-80129, 2008 U.S. Dist. LEXIS 79777 (N.D. Cal. Aug. 18, 2008) (no general rule prohibiting plaintiffs from seeking non-party discovery of documents likely to be in defendants' possession); Koch v. Greenberg, No. 07-9600, 2009 U.S. Dist. LEXIS 61913, *18-19 (S.D.N.Y. July 14, 2009) (non-party shall comply with subpoena prior to party's production); Ireh v. Nassau Univ. Med. Ctr., No. Civ. A. 06-09, 2008 U.S. Dist. LEXIS 76583, *17 (E.D.N.Y. Sept. 17, 2008) (subpoena for plaintiff's file may served on non-party hospital even though this file was not sought in discovery addressed to plaintiff); Software Rights Archive, LLC v. Google, Inc., No. Civ. A. 08-03172, 2009 U.S. Dist. LEXIS 43835, *6 (D. Del. May 21, 2009) ("there is no absolute rule prohibiting a party from seeking to obtain the same documents from a non-party as can be obtained from a party, nor is there an absolute rule providing that the party must first seek those documents from an opposing party before seeking them from a non-party").

This principle has particular force in cases in which plaintiffs seek a "non-well-defined set" of documents, meaning "a set whose completeness is not readily verifiable."  Viacom, 2008 U.S. Dist. LEXIS 79777, at *8.  In Viacom, the plaintiffs claimed that their copyrighted material was posted on defendant YouTube, Inc.'s ("YouTube") internet site, later acquired by defendant Google, Inc. ("Google").  Id. at

*3-4.  Seeking to establish intent, knowledge and financial motivation to copy their intellectual property, plaintiffs served a subpoena upon three non-party venture capital firms involved in YouTube's initial rounds of investment and eventual acquisition by Google.  Id. at *4-5.  The non-parties opposed the subpoenas, contending that plaintiffs "should not be permitted to request from nonparty respondents documents that are likely to be in defendants' possession."  Id. at *7.  In rejecting this position, the court held that "[i]n appropriate circumstances, production from a third party will be compelled in the face of an argument that the "same" documents could be obtained from a party, because there is reason to believe that the files of the third party may contain different versions of documents, additional material, or perhaps, significant omissions. Id. (quoting Visto Corp. v. Smartner Info. Sys., Ltd., Nos. Civ. A. 06-80339, 06-80352, 2007 WL 218771, at *3 (N.D. Cal. Jan. 29, 2007)).  The court further held that there was "no way to determine if all communications between YouTube and respondents have been produced simply by looking at YouTube's production."  Id. at *8-9.

Movants also seek discovery from WME as to it internal communications and communications with artists, which would not likely be available from Live Nation.  This discovery is crucial to Movants because these communications will reveal the booking agents' and artists' reaction to Live Nation's demands and, as such, are highly probative of the extent to which Live Nation's conduct has had an anticompetitive affect.  It makes no sense to require Movants to complete discovery of Live Nation before seeking to obtain from WME information that would not likely be available from Live Nation.

In any event, while they did not believe they were required to do so, in an effort to avoid a dispute, Movants did not immediately move to enforce the Subpoena hoping that, when Live Nation's document production was completed, WME would

voluntarily agree to respond to the Subpoena.  However, as a result of difficulties it claims to have experienced in producing electronically stored data, Live Nation has yet to complete its production of information stored in this format.  With an existing discovery cut-off of November 30, 2010, Movants cannot wait until Live Nation's document production is complete to obtain discovery from WME.  Even if the discovery cut-off is extended, it will not likely be extended sufficiently for Movants to delay obtaining discovery from WME, particularly in that Live Nation has yet to commit to a certain date when it will complete document discovery.

### C.   A Confidentiality Order Has Been Entered That Adequately Protects WME's Confidential And Proprietary Business Information And Any Other Third Party's Confidential Information

The fact that a subpoena seeks confidential information is not a legitimate basis for noncompliance.  Where a subpoena seeks confidential information, "discovery is virtually always ordered once the movant has established that the secret information is both relevant and necessary."  Compaq, supra, 163 F.R.D. at 338 (quoting Coca-Cola Bottling Co. v. Coca-Cola Co., 107 F.R.D. 288, 293 (D. Del. 1985)).  The court in Compaq stated that production of the non-party's commercially-sensitive documents would be appropriately protected if the documents were classified in accordance with the existing protective order in the underlying litigation.  Id. at 339.

In the Underlying Action, a Stipulated Order Regarding Confidentiality of Discovery Material was entered as an Order of the Court (hereinafter, "Confidentiality Stipulation").  (Robbins Decl., ¶ 20 and Ex. N attached thereto.)  The Confidentiality Stipulation extends to documents which any **non-party** produces.  (Id., ¶ 21 and Ex. N attached thereto.)  Any documents a non-party designates as Confidential may only be disclosed to the Court, court reporters and other support staff, counsel for the parties, representatives of the parties involved in this litigation and witnesses.  (See

Ex. N to *Robbins Decl*.)  WME may also designate documents "Highly Confidential" in which event they may not be disclosed to any representatives of the parties.  (Id.) Further, the Confidentiality Stipulation contains limitations designed to protect the confidentiality of any confidential documents utilized at trial.  (Id.)  These provisions contain adequate protection for any confidential information WME produces.

### D.    WME Must Produce Documents Despite Its Self-Created Inability To Comply Because Of Undue Burden And Expense

To evaluate burden, this Court must consider "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of discovery in resolving the issues."  Fed. R. Civ. P. 26(b)(2)(C)(iii).  The fact that complying with a discovery request will involve expense and effort does not necessarily render it unduly burdensome.  United States v. Am. Optical Co., 39 F.R.D. 580, 586-87 (N.D. Cal. 1966) (claim that non-party discovery would be unduly burdensome because it would necessitate examination of large quantities of documents, requiring great deal of time and expense, failed because discovery was otherwise appropriate); accord Jackson v. Montgomery Ward & Co., 173 F.R.D. 524, 529 (D. Nev. 1997).

This is an extremely important case to Movants as the result will directly impact the success of their businesses and millions of dollars in damages are claimed. Additionally, as is set forth previously, the discovery sought is of fundamental importance to the case.  As to its resources, WME is an international talent agency, with offices, among others, in New York and Los Angeles, that represents many high profile actors, artists and authors.  (See Ex. H to *Robbins Decl*.)  It is also difficult to believe that the Subpoena seeks voluminous documents or that it would require substantial effort to locate those documents given that it seeks the production documents relating to the negotiation and execution of promotional and venue

services contracts for only 29 artists.  It does not seek any documents relating to the production or performance of those concerts or to any other matter involving the artist. The Subpoena is also limited to a four-year time period, promotional contracts are rarely negotiated more than once a year and artists do not tour every season.  It would furthermore be surprising if specific files were not maintained for the negotiation of these contracts.  Moreover, each artist is represented by a specific agent within WME and relevant documents could be obtained by searching that agent's records.  Further, as promotional contracts are generally negotiated in the late fall through early winter, and in any event the date of the negotiations can be determined by the date of the agreement, the agent's records only need be searched for a defined time period.

It is also noted that the other talent agencies upon which plaintiffs served subpoenas have generally complied.  (*Robbins Decl.*, ¶ 11.)  Further, the Department of Justice ("DOJ") is conducting an investigation of whether Live Nation has violated a Consent Judgment approving with conditions its merger with Ticketmaster. Movants are informed that numerous booking agencies have received Civil Investigative Demands from the DOJ and, on this basis, believe that WME agency is one of these agencies.  As Movants were also served with Civil Investigative Demands, they believe that WME would have had to gather, at least some, of the documents sought in the Subpoena in order to comply with the DOJ's demands.

WME claims that the Subpoena compels it to retrieve 1,300 bankers' boxes from off-site storage facilities throughout the country and engage in costly and time consuming restoration of monthly backup tapes of its electronic records.  If this is true, it is because of the unique manner in which WME maintains its business records. Movants cannot be foreclosed from appropriately-sought discovery simply because WME chooses to store its documents in a manner not conducive to retrieval.  A party who has the means to produce documents in its possession and is served with a

subpoena *duces tecum* will not be excused from doing so based on self-created inability or passive inactivity when reasonable effort might secure compliance.  <u>See</u> 98 C.J.S. Witnesses § 48 (West Supp. 2009) (citing <u>People v. Rezek</u>, 103 N.E.2d 127, 132 (Ill. 1951)).

## <u>WME'S POSITION IN OPPOSITION</u>

While Courts liberally interpret the discovery provisions of the Federal Rules of Civil Procedure, the right to discovery is not without limit.  <u>Travelers Indem. Co. v. Metro. Life Ins. Co.</u>, 228 F.R.D. 111, 113 (D. Conn. 2005).  Rule 26(c) provides that, upon a showing of good cause, the presiding court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense." Fed.R.Civ.P. 26(c).  Likewise, Rule 45(c)(3)(A) provides that a Court "shall quash or modify" a subpoena if it subjects a person to undue burden.  Fed.R.Civ.P. 45(c)(3)(A).  Particularly with respect to antitrust litigation, Courts have recognized the extraordinary burden of discovery and refuse to permit plaintiffs to proceed to costly discovery without first demonstrating minimum threshold plausibility.  <u>See</u> <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 546 (2007).

In determining whether a subpoena imposes an undue burden under Rules 26 and 45, Courts balance six factors:

(1) the relevance of the information requested;

(2) the need of the party for production;

(3) the breadth of the request for production;

(4) the time period covered by the subpoena;

(5) the particularity with which the subpoena describes the requested production; and

(6) the burden imposed.

See Televisa, S.A. de C.V. v. Univision Communications, Inc., 2008 WL 4951213, *2 (C.D. Cal. 2008); see also Moon, supra, at 637; Travelers Indem. Co., supra, at 113.

Courts especially scrutinize efforts by parties to a litigation to extract costly and burdensome discovery from non-parties.  Dart Indus. Co. Inc. v. Westwood Chem. Co., Inc., 649 F.2d 646, 649 (9th Cir. 1980) (Discovery restrictions broadened when target is a non-party).  Courts will act to limit burdensome non-party discovery particularly where, as here, the discovery sought may obtain the same discovery from parties to the litigation. See Moon v. SCP Pool Corp., 232 F.R.D. 633, 637-638 (C.D. Cal. 2005); Haworth, Inc. v. Herman Miller, Inc., 998 F.2d 975, 978 (Fed. Cir. 1993) (Affirming order requiring party to first attempt to obtain documents from opposing party rather than non-party).

Plaintiffs rely heavily on Viacom Int'l, Inc. v. YouTube, Inc., No. Civ. A. 08-80129, 2008 U.S. Dist. LEXIS 79777 (N.D. Cal. Aug. 18, 2008) for the proposition that Courts generally do not prohibit discovery from non-parties.  However, Viacom is entirely distinguishable in that (1) the plaintiffs in Viacom needed to conduct discovery as to non-parties because of the party defendant's (YouTube) poor initial record keeping; and (2) the discovery at issue was not "so broad and harmful that the courts required them to first seek discovery from parties to the dispute."  See Viacom, U.S. Dist. LEXIS 79777, at *9.  In Viacom, the Court notes that the completeness of YouTube's records were called into question as a result of YouTube's early days of operation from a garage and other various short-term offices, and the "transient nature and the haphazard methods of early email correspondence."  See Viacom, U.S. Dist. LEXIS 79777, at *7.  Here, Plaintiffs do not face any of the record-keeping issues with Live Nation that the Viacom plaintiffs encountered with YouTube.  Indeed, Plaintiffs have made no showing, apart from mere speculation, that Live Nation will not produce full and complete records of its relevant correspondence and documents.

Additionally, and significantly, the Court in <u>Viacom</u> specifically acknowledges that non-parties are entitled to protections against overly broad and harmful discovery. <u>See Viacom</u>, U.S. Dist. LEXIS 79777, at *9.  Where, as here, the discovery in question is "massively duplicative," and "extended far beyond the pertinent geographic region," Courts should protect non-parties against such burdensome and intrusive discovery.  <u>See Viacom</u>, U.S. Dist. LEXIS 79777, at *9.

Additionally, the Court may quash a subpoena under Rule 45 if it "requires disclosure of a trade secret or other confidential research, development, or commercial information. . . ."  Fed.R.Civ.P. 45(c)(3)(B); <u>See Moon v. SCP Pool Corp.</u>, 232 F.R.D. 633, 637 (C.D. Cal. 2005)

Based upon the balancing factors set forth above, Plaintiffs cannot legitimately contend that the Subpoena imposes anything but an undue burden on WME. Moreover, the Subpoena encompasses documents containing highly confidential and trade secret information that WME carefully guards from dissemination to the public. For these reasons, the Subpoena should be quashed in its entirety.

### A.    The Subpoena Imposes An Undue Burden On WME

Upon applying the above-reference criteria, the Subpoena clearly imposes an undue burden on WME as follows.

### 1.    The Subpoena Encompasses Large Amounts Of Irrelevant Documents

In antitrust cases, courts are particularly concerned with limiting discovery to the "relevant market."  <u>See Manufacturing Research Corp. v. Greenlee Tool Co.</u>, 693 F.2d 1037, 1043 (11th Cir. 1982) (court denied discovery into a related market and instead limited discovery to the scope of the relevant market); <u>Intergraph Corp. v. Intel Corp.</u>, 195 F.3d 1346, 1354 (Fed. Cir. 1999) (defendant's market power in another market was irrelevant to the issues of the case).  Generally, the "relevant

market" is defined as the market to which access has been sought and foreclosed by anticompetitive conduct.  See Fishman v. Estate of Wirtz, 807 F.2d 520, 531-532 (7th Cir. 1986).  Especially where, as here, the plaintiffs' claims are entirely local in nature, Courts are reluctant to permit costly discovery outside of the relevant region.  See American Key Corporation v. Cole National Corporation, 762 F.2d 1569, 1576-77 (11th Cir. 1985) (district court did not abuse its discretion by restricting discovery to the region where the plaintiff conducted business); Schmidt v. Columbia Pictures Indus., Inc., 1986 WL 13357 (D. Nev. 1986).

Here, Plaintiffs' Complaint is undeniably centered on the effect of Live Nation's alleged monopolistic conduct on the Balitmore region.  Plaintiffs admittedly own but one venue, the Merriweather, in the Baltimore, Maryland area.  See, e.g., Complaint at ¶¶ 8-10, 127-128.  Likewise, Plaintiffs' entire action relates to their ability (or inability) to compete in the Baltimore market by booking artists in their venue, Merriweather.  See, e.g., Complaint at ¶ 150.  Thus, Plaintiffs cannot legitimately contend that the "relevant market" for their antitrust claims extends beyond the Baltimore region.

While Plaintiffs' market presence is admittedly limited only to the Baltimore region, the Subpoena is expansively drafted and seeks discovery of information reaching far beyond the "relevant market."  The requests literally call for production of every shred of paper "generated during" the relevant six-year time frame, irrespective of geographic location or whether the subject matter of the documents relate at all to Plaintiffs' concert promotion business in the Baltimore area (see, e.g., Categories 2, 5, 6, 8, 9, 12, which broadly seek documents relating to negotiations between WME and Plaintiffs or Live Nation and documents "memorializing, generated during, reporting upon or otherwise reflecting" any negotiation with any venue regarding block booked or multiple appearance contracts for a six year period).

Plaintiffs offer no explanation for why they need to conduct broad discovery as to WME's negotiations with other third-party promoters and venues throughout the country.  Likewise, such negotiations do not have any relation to Plaintiffs' own regional concert promotion business in Baltimore.

In addition to being outside the scope of the "relevant market," the documents Plaintiffs request are inherently unreliable to evidence Live Nation's market conduct in that WME's negotiations, like all negotiations, contain posturing and puffery that is, at most, hearsay evidence of true regional market conditions.  Additionally, agreements successfully negotiated and entered into by third-party promoters with WME cut against Plaintiffs' argument that Live Nation's allegedly anti-competitive conduct prevents other promoters from effectively competing.  Given the above, WME's communications with third-party promoters and venues is of little or no relevance to Plaintiffs' underlying claims.

### 2.    Plaintiffs Do Not Need The Documents Described In The Subpoena

Plaintiffs have no need to seek the broad discovery described in the Subpoena.  After excluding the irrelevant documents described above, the remaining documents encompassed by the Subpoena consist almost entirely of documents relating to communications between WME and Live Nation, or WME and Plaintiffs.  Given that Live Nation and Plaintiffs are in possession of the emails and other documents relating to their communications with WME, Plaintiffs have no need to seek redundant and duplicative documents from WME.  As set forth above, Courts are particularly concerned with protecting non-parties from onerous discovery obligations when discovery is duplicative and burdensome.  See Moon v. SCP Pool Corp., supra, at 637; Harris v. Wells, No. B-89-391, 1990 WL 150445, at *4 (D.Conn. Sept.5, 1990) (defendant's discovery requests to 23 nonparties were barred until plaintiffs

produced the requested documents because they were massively duplicative and would likely cause harm to plaintiffs' business).

### 3.   The Subpoena Lacks Specificity

Plaintiffs' Subpoena entirely lacks specificity and commands production of any document even tangentially related to WME's negotiations of block-booked and multiple appearance agreements. By painting with such a broad brush, Plaintiffs effectively demand production of every shred of paper generated by WME from 2003 to the present, thereby placing the onus of discovery wholly upon WME. By refusing to craft a well-tailored discovery plan that identifies documents actually needed in the litigation, Plaintiffs place an expensive and commercially risky discovery burden on WME who is commanded by the Subpoena to give the parties complete, unfettered access to its documents and records.

### 4.   The Subpoena Imposes A Heavy Burden On WME

As set forth in WME's Supplemental Statement of Facts, the burden imposed by the Subpoena is tremendous. Even when fully utilizing a third-party vendor, a search of WME's ESI would require thousands of hours of collecting data from numerous sources, processing the data into a usable format, reviewing the documents for responsiveness, privilege and confidentiality, and finally production. Coupled with the difficulty in retrieving and searching WME's physical files, responding to the Subpoena is a herculean task. As set forth in the detailed estimate provided by the third-party ESI specialist retained by WME, the cost to process and review ESI alone exceeds $3.5 million. If WME were to utilize outside counsel to perform the document review, as it must do to adequately safeguard its commercially sensitive information, the costs would easily triple. Indeed, there is rarely a case where imposing such a heavy burden on a non-party is justified. Here, where Plaintiffs have

not even exhausted party discovery in an effort to reduce the burden imposed on non-parties, the Subpoena is particularly offensive and should be quashed.

### B.   The Court Should Quash The Subpoena Because It Commands Production Of Highly Sensitive Commercial and Trade Secret Information

Courts may quash a subpoena if it "requires disclosure of a trade secret or other confidential research, development, or commercial information." Fed.R.Civ.P. 45(c)(3)(B); see also Moon v. SCP Pool Corp., supra, at 637-638. As set forth above, WME relies upon its experience in the marketplace to negotiate favorable agreements on behalf of its clients. The details of WME's negotiations and the terms of the agreements that WME enters into on behalf of its clients constitute highly sensitive, commercial information and trade secrets of both WME and its clients. Likewise, the information, in many cases, is subject to confidentiality agreements between WME and its clients and may not be disclosed as a matter of contract.

Here, where the parties requesting the information negotiate on the other side of the table from WME, disclosure of the requested information is particularly harmful to the commercial interests of WME and its clients. Plaintiffs and Live Nation stand to greatly benefit from the collective knowledge to be gained from WME's negotiations on behalf of their clients. Moreover, despite the stipulated protective order entered by the Court, there is no guaranty that the sensitive information will not leak to other agency competitors of WME, or even to the general public. Especially since Plaintiffs' request is not reasonably bounded by any geographical limitations, WME would risk significant harm to its entire nationwide Personal Appearance business if forced to respond to the Subpoena.

### C.    The Court Should Alternatively Shift The Burden Of Discovery To Plaintiffs

While WME vigorously disputes that Plaintiffs have any entitlement to the excessive discovery referenced in the Subpoena, WME should not be made to bear the cost of responding if the Court determines that such discovery is necessary.  It is well-settled that the cost of discovery should be shifted to the requesting party where such discovery is unnecessary and wasteful.  See F.R.C.P. 34(a); see also In re Coordinated Pretrial Proceedings in Petroleum Products Antitrust Litig., 669 F.2d 620, 623 (10th Cir. 1982); Rodger v. Elec. Data Sys., Corp., 155 F.R.D. 537, 542 (E.D.N.C. 1994) ("unnecessary, wasteful discovery is best avoided by taxing the cost of its production against the party seeking it.").  Particularly where the responding party can show that production entails, among other things, extreme expense, uneven burden and less relevant information, Courts impose the burden of responding to discovery on the requesting party.  See Bills v. Kennecott Corp., 108 F.R.D. 459, 462 (D. Utah 1985); F.R.C.P. 26(c).  Here, Plaintiffs seek discovery that is disproportionate and excessive compared to their claims.  To the extent Plaintiffs are entitled to conduct the baseless fishing expedition described in their Subpoena at all, WME as a non-party should not be made to suffer the costs.

### SPECIFIC REQUESTS, WME'S RESPONSES, MOVANTS' ARGUMENTS IN SUPPORT OF, AND WME'S ARGUMENTS AGAINST, PRODUCTION

### REQUEST NO. 1

Any and all documents constituting, memorializing, reporting upon or referring to any communications concerning the appearance or potential appearance of an artist at Merriwather.

## OBJECTIONS TO REQUEST NO. 1

In addition to the General Objections, each of which is incorporated herein by this reference, WME further objects to this Request on the ground that it is overbroad and unduly burdensome in that it seeks far-reaching discovery from a third-party without first exhausting efforts to obtain such information from party witnesses in violation of Federal Rules of Civil Procedure 45. The Request is also overbroad in that it requests production of documents relating to artists and deals not specifically at issue in Plaintiffs' Complaint and is, in substance, an impermissible "fishing expedition" by Plaintiffs. The Request is also overbroad in that it purportedly includes, among other things, communications by administrative and support staff and other individuals, that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. WME further objects to the extent it seeks confidential and proprietary information, trade secrets, including confidential information belonging to third-parties, including all of WME's clients, and/or other information protected from disclosure by WME's agreements or duties to other third-parties. The Request is also overbroad in that it fails to state an applicable time frame.

## REASONS WHY WME MUST PRODUCE DOCUMENTS

This request is calculated to discover any documents reflecting WME artists' experiences at Merriweather and willingness to appear there.  These documents are reasonably calculated to determine whether Live Nation curtailed competition in the market for providing venue services to artists, to investigate Live Nation's defense that all artists appearing at Jiffy Lube Live preferred this venue over Merriweather and to determine whether Live Nation obtained an unfair advantage in competing with Movants by offering artists on a national, block-booked or multi-appearance tour the ability to appear at Live Nation controlled venues.  For instance, documents reflecting that artists preferred Merriweather or found either Merriweather or Jiffy Lube Live adequate would disprove Live Nation's claim that artists appearing at Jiffy Lube Live preferred that venue.  Additionally, evidence that artists, who did not entertain an offer from Merriweather or rejected a competitive offer to appear at Merriweather, actually preferred Merriweather or found either venue adequate would tend to prove that Live

Nation's conduct limited competition in the market for providing venue services to artists and gave it an unfair advantage in competing for artists.

As only 9 of the artists to whom Movants have narrowed their Subpoena appeared at Merriweather during the specified time period, it is difficult to believe that it would be burdensome for WME to locate and produce the requested documents.

## WME'S REASONS WHY REQUEST NO. 1 SHOULD BE QUASHED

This request is overbroad in that it seeks "[a]ny and all documents constituting, memorializing, reporting upon or referring to any communications concerning the appearance or potential appearance of an artist at Merriweather."  As drafted, the request includes, among other things, communications only tangentially relating to a particular appearance, all communications relating to the technical aspects of a performance, performers' travel and personal arrangements, and numerous other issues that are wholly irrelevant to Plaintiffs' dispute with Live Nation.  Likewise, if the artist's appearance at Merriweather was a part of a multiple-appearance tour, Plaintiffs also demand production of documents relating to the non-Merriweather appearances. Plaintiffs have no need for such documents because negotiations where artists decided to play Merriweather are not be relevant to Plaintiffs' claims that artists were discouraged from playing Merriweather.   Furthermore, while Plaintiffs claim that the request is limited to only 9 artists who actually appeared at Merriweather, the request itself specifically demands production of any communications relating to even potential appearances at Merriweather, which significantly expands the scope of the request.  Additionally, as set forth above, limiting the scope of the request to 29 artists does not alter the amount of the burden imposed on WME.

Documents that are plainly irrelevant to Plaintiffs' claims fall outside the scope of discoverable information.  See American Key Corporation v. Cole National Corporation, 762 F.2d 1569, 1576-77 (11th Cir. 1985) (district court did not abuse its

discretion by restricting discovery to the region where the plaintiff conducted business); <u>Manufacturing Research Corp. v. Greenlee Tool Co.</u>, 693 F.2d 1037, 1043 (11th Cir. 1982) (court denied discovery into a related market and instead limited discovery to the scope of the relevant market); <u>see</u> <u>also</u> <u>Intergraph Corp. v. Intel Corp.</u>, 195 F.3d 1346, 1354 (Fed. Cir. 1999) (defendant's market power in another market was irrelevant to the issues of the case).

Moreover, the request is unduly burdensome.  Plaintiffs already possess the vast majority of communications relating to the appearances of WME artist clients at the Merriweather given that they negotiated the details of the appearances with WME. Any evidence of anti-competitive communications by Live Nation to WME artist clients should be produced in party discovery.  There is simply no reason Plaintiffs should impose the significant cost of excessive document discovery on a non-party merely to establish, through hearsay evidence, that artists found Merriweather to be an "adequate" venue.  WME would need to comb through terabytes of data spread across computer servers and 166 individual work stations physically located at WME offices in four different cities around the United States.  Additionally, to produce hard copy files, WME would need to retrieve each physical file from its respective storage location, the vast majority of which are maintained in off-site storage.  Obtaining and reviewing responsive electronic and hard copy documents would cost WME countless man hours and millions of dollars.

Finally, while WME has not collected and reviewed the documents, WME is informed and believes that responsive documents would contain confidential and proprietary information belong to WME's clients.  A protective order is insufficient protection to WME's clients and other third parties, whose confidential information would be provided to entities that frequently negotiate across the table from them. WME's ability to negotiate future appearance deals on behalf of its clients would be

significantly impaired if its clients' confidential information were disclosed in this litigation.  Likewise, to the extent any documents contain privileged information, Plaintiffs are not entitled to discovery as to those documents.

## REQUEST NO. 2

Each and every document memorializing, generated during, reporting upon or otherwise reflecting any discussions with Live Nation concerning the promotion, production or sponsoring of any national, block booked or multi-appearance tour of any artist represented by You and/or Marc Geiger and/or Rob Beckham and/or Cara Lewis and/or Barbara Skydel, including but not limited to Nine Inch Nails, John Mayer, Rascall Flatts, Brad Paisley, Eminem, Lil' Wayne, Kanye West, Tom Petty and/or Roger Waters, anytime between January 1, 2006 and the present.

## OBJECTIONS TO REQUEST NO. 2

In addition to the General Objections, each of which is incorporated herein by this reference, WME further objects to this Request on the ground that it is overbroad and unduly burdensome in that it seeks far-reaching discovery from a third-party without first exhausting efforts to obtain such information from party witnesses in violation of Federal Rules of Civil Procedure 45. Given that Plaintiffs' Complaint states specific facts relating to but one venue (Merriweather) and one artist (The Jonas Brothers), the Request is also overbroad in that it requests production of documents relating to artists, deals and venues not specifically at issue in Plaintiffs' Complaint and is, in substance, an impermissible "fishing expedition" by Plaintiffs. The Request is also overbroad in that it purportedly includes, among other things, every document generated during a nearly 4-year period. WME further objects in that the Request seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. WME further objects to the extent it seeks confidential and proprietary information, trade secrets, including confidential information belonging to third parties, including all of WME's clients, and/or other information protected from disclosure by WME's agreements or duties to other third-parties.

## REASONS WHY WME MUST PRODUCE DOCUMENTS

In this request, Movants seek any communications between Live Nation and WME concerning national, multi-appearance or block-booked tours for the 29 artists to which the Subpoena applies.  These communications are highly probative as Live

Nation's offering artists the ability to appear only at venues it controls during the course of national, block-booked or multi-appearance tours and any response to this practice would likely have been expressed in these communications.  Similarly, Live Nation's insistence that an artist appear at a venue in a geographic area in which it faces competition in order to appear at venues in which it controls the only, most prestigious or a monopoly of the available venues (and any reaction to this requirement) would likely be expressed in these communications.  These documents are furthermore relevant to Movants' claims that Live Nation guarantees artists prices in excess of the amount generated by ticket sales, and will demonstrate what artists were forced to concede, including choice of venue, to secure Live Nation's promotional services.

Moreover, as this request seeks any documents "reporting upon" any discussions with Live Nation, it encompasses communications between WME and the artists about the negotiations with Live Nation.  As is set forth previously, these communications are highly probative because they may reflect the artists' reaction to Live Nation's demands or conditions.

## WME'S REASONS WHY REQUEST NO. 2 SHOULD BE QUASHED

Request No. 2 is overbroad and unduly burdensome.  Even as limited by Plaintiffs, the request seeks "each and every document memorializing, generated during, reporting upon or otherwise reflecting any discussions with Live Nation" for 29 of WME's clients.  Plaintiffs' request is expansively drafted and literally encompasses every physical and electronic document generated by WME since 2006. The request encompasses documents relating to appearances in every geographic location that Live Nation does business, nearly all of which are entirely unrelated to Plaintiffs' alleged Baltimore business, and their claimed business losses in the Baltimore region.  Such documents fall outside the scope of discoverable information.

See American Key Corporation v. Cole National Corporation, 762 F.2d 1569, 1576-77 (11th Cir. 1985) (district court did not abuse its discretion by restricting discovery to the region where the plaintiff conducted business); Manufacturing Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1043 (11th Cir. 1982) (court denied discovery into a related market and instead limited discovery to the scope of the relevant market); see also Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1354 (Fed. Cir. 1999) (defendant's market power in another market was irrelevant to the issues of the case). Moreover, the request includes documents relating to the technical aspects of a performance, performers' travel and personal arrangements, and numerous other issues that are wholly irrelevant to Plaintiffs' dispute with Live Nation.  There is no legitimate basis upon which Plaintiffs can claim entitlement to such an extraordinary discovery request, and Plaintiffs do not come close in justifying their position. Furthermore, as previously discussed, the limitation to 29 artists does not alter the amount of the burden imposed on WME.

       To the extent the request is limited only to WME's communications with Live Nation, which on its face it is not, all such communications will be produced by Live Nation in party discovery.  In order to produce the very same documents in Live Nation's possession, WME would need to comb through terabytes of data spread across computer servers and 166 individual work stations physically located at WME offices in four different cities around the United States.  Additionally, to produce hard copy files, WME would need to retrieve each physical file from its respective storage location, the vast majority of which are maintained in off-site storage.  Obtaining and reviewing responsive electronic and hard copy documents would cost WME countless man hours and millions of dollars.  Accordingly, the request is entirely duplicative and wasteful.

Finally, while WME has not collected and reviewed the documents, WME is informed and believes that responsive documents would contain confidential and proprietary information belong to WME's clients.  A protective order is insufficient protection to WME's clients and other third parties, whose confidential information would be provided to entities that frequently negotiate across the table from them. WME's ability to negotiate future appearance deals on behalf of its clients would be significantly impaired if its clients' confidential information were disclosed in this litigation.  Likewise, to the extent any documents contain privileged information, Plaintiffs are not entitled to discovery as to those documents.

**REQUEST NO. 5**

Each and every document memorializing, generated during, reporting upon or otherwise relating to the negotiation of any contract, agreement or understanding for Live Nation to promote, produce or sponsor on a tour, block booked or multi-appearance basis, any of Your and/or Marc Geiger's and/or Rob Beckham's and/or Cara Lewis' and/or Barbara Skydel's client-artists, including but not limited to the tours and/or appearances of Nine Inch Nails, John Mayer, Rascall Flatts, Brad Paisley, Eminem, Lil' Wayne, Kanye West, Tom Petty and/or Roger Waters, anytime between January 1, 2006 and the present.

**OBJECTIONS TO REQUEST NO. 5**

In addition to the General Objections, each of which is incorporated herein by this reference, WME further objects to this Request on the ground that it is overbroad and unduly burdensome in that it seeks far-reaching discovery from a third-party without first exhausting efforts to obtain such information from party witnesses in violation of Federal Rules of Civil Procedure 45. Given that Plaintiffs' Complaint states specific facts relating to but one venue (Merriweather) and one artist (The Jonas Brothers), the Request is also overbroad in that it requests production of documents relating to artists, deals and venues not specifically at issue in Plaintiffs' Complaint and is, in substance, an impermissible "fishing expedition" by Plaintiffs. The Request is also overbroad in that it purportedly includes, among other things, every document generated during a nearly 4-year period. WME further objects in that the Request seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. WME further objects to the extent it

seeks confidential and proprietary information, trade secrets, including confidential information belonging to third parties, including all of WME's clients, and/or other information protected from disclosure by WME's agreements or duties to other third-parties.

## REASONS WHY WME MUST PRODUCE DOCUMENTS

This request seeks documents generated during or reflecting any communications during the actual negotiation of any national, block-booked or multi-appearance tour, including communications between WME and its artist clients.  For the reasons set forth with respect to request 2, these documents are highly probative and must be produced.

## WME'S REASONS WHY REQUEST NO. 5 SHOULD BE QUASHED

Request No. 5 is objectionable for the same reasons stated in response to Request No. 2.  Even as limited by Plaintiffs, the request seeks "each and every document memorializing, generated during, reporting upon or otherwise reflecting any contract, agreement or understanding for Live Nation to promote, produce or sponsor" appearances for 29 of WME's clients.  Plaintiffs' request is expansively drafted and literally encompasses every physical and electronic document generated by WME since 2006.  The request encompasses documents relating to appearances in every geographic location that Live Nation does business, nearly all of which are entirely unrelated to Plaintiffs' alleged Baltimore business, and their claimed business losses in the Baltimore region.  Such documents fall outside the scope of discoverable information.  See American Key Corporation v. Cole National Corporation, 762 F.2d 1569, 1576-77 (11th Cir. 1985) (district court did not abuse its discretion by restricting discovery to the region where the plaintiff conducted business); Manufacturing Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1043 (11th Cir. 1982) (court denied discovery into a related market and instead limited discovery to the scope of the relevant market); see also Intergraph Corp. v. Intel Corp., 195 F.3d

1346, 1354 (Fed. Cir. 1999) (defendant's market power in another market was irrelevant to the issues of the case). Moreover, the request includes documents relating to the technical aspects of a performance, performers' travel and personal arrangements, and numerous other issues that are wholly irrelevant to Plaintiffs' dispute with Live Nation. There is no legitimate basis upon which Plaintiffs can claim entitlement to such an extraordinary discovery request, and Plaintiffs do not come close in justifying their position. Furthermore, as previously discussed, the limitation to 29 artists does not alter the amount of the burden imposed on WME.

Additionally, all documents responsive to this request will be produced by Live Nation in party discovery. In order to produce the very same documents in Live Nation's possession, WME would need to comb through terabytes of data spread across computer servers and 166 individual work stations physically located at WME offices in four different cities around the United States. Additionally, to produce hard copy files, WME would need to retrieve each physical file from its respective storage location, the vast majority of which are maintained in off-site storage. Obtaining and reviewing responsive electronic and hard copy documents would cost WME countless man hours and millions of dollars. Accordingly, the request is entirely duplicative and wasteful.

Finally, while WME has not collected and reviewed the documents, WME is informed and believes that responsive documents would contain confidential and proprietary information belong to WME's clients. A protective order is insufficient protection to WME's clients and other third parties, whose confidential information would be provided to entities that frequently negotiate across the table from them. WME's ability to negotiate future appearance deals on behalf of its clients would be significantly impaired if its clients' confidential information were disclosed in this

litigation.  Likewise, to the extent any documents contain privileged information, Plaintiffs are not entitled to discovery as to those documents.

**REQUEST NO. 6**

Each and every document memorializing, generated during, reporting upon or otherwise relating to the negotiation of any contract, agreement or understanding covering an artist's appearance during any tour or other performance covered by any contract, memorandum of understanding, term sheet, deal sheet, confirmatory email or correspondence or other agreement identified in Request 3.

**OBJECTIONS TO REQUEST NO. 6**

In addition to the General Objections, each of which is incorporated herein by this reference, WME further objects to this Request on the ground that it is overbroad and unduly burdensome in that it seeks far-reaching discovery from a third-party without first exhausting efforts to obtain such information from party witnesses in violation of Federal Rules of Civil Procedure 45. Given that Plaintiffs' Complaint states specific facts relating to but one venue (Merriweather) and one artist (The Jonas Brothers), the Request is also overbroad in that it requests production of documents relating to artists, deals and venues not specifically at issue in Plaintiffs' Complaint and is, in substance, an impermissible "fishing expedition" by Plaintiffs. The Request is also overbroad in that it purportedly includes, among other things, every document generated during a nearly 4-year period. WME further objects in that the Request seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. WME further objects to the extent it seeks confidential and proprietary information, trade secrets, including confidential information belonging to third parties, including all of WME's clients, and/or other information protected from disclosure by WME's agreements or duties to other third-parties.

**REASONS WHY WME MUST PRODUCE DOCUMENTS**

Through this request, Movants first seek to determine whether there were separate contracts for the appearance of artists Live Nation was promoting on a national tour, block-booked or multi-appearance basis at the various venues played during the tour.  The absence of separate contract for the artist's appearance at the venue would establish a nexus between Live Nation's providing promotional and

venue services, which would evidence that Live Nation's providing promotional services was tied to the artist appearing at Live Nation controlled venues. If there are separate contracts for venue services, a nexus between promotional and venue services may also be established if one contract covers the appearance for all venues, the venue contracts are identical or incorporates terms from the promotional contract. It would be unusual if WME did not maintain contract files for these appearances that could be readily accessed.

### WME'S REASONS WHY REQUEST NO. 6 SHOULD BE QUASHED

Request No. 6 contains the same broad language as Requests Nos. 5 and 2, and is objectionable for the same reasons set forth above. This request seeks "each and every document memorializing, generated during, reporting upon or otherwise reflecting any contract, agreement or understanding covering an artist's appearance during any tour or other performance" that in any way relates to an agreement with Live Nation. Plaintiffs' request is expansively drafted and literally encompasses every physical and electronic document generated by WME since 2006. The request encompasses documents relating to appearances in every geographic location that Live Nation does business, nearly all of which are entirely unrelated to Plaintiffs' alleged Baltimore business, and their claimed business losses in the Baltimore region. Such documents fall outside the scope of discoverable information. See American Key Corporation v. Cole National Corporation, 762 F.2d 1569, 1576-77 (11th Cir. 1985) (district court did not abuse its discretion by restricting discovery to the region where the plaintiff conducted business); Manufacturing Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1043 (11th Cir. 1982) (court denied discovery into a related market and instead limited discovery to the scope of the relevant market); see also Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1354 (Fed. Cir. 1999) (defendant's market power in another market was irrelevant to the issues of the case). Moreover,

the request includes documents relating to the technical aspects of a performance, performers' travel and personal arrangements, and numerous other issues that are wholly irrelevant to Plaintiffs' dispute with Live Nation.  There is no legitimate basis upon which Plaintiffs can claim entitlement to such an extraordinary discovery request, and Plaintiffs do not come close in justifying their position.  Furthermore, as previously discussed, the limitation to 29 artists does not alter the amount of the burden imposed on WME.

Additionally, all documents responsive to this request will be produced by Live Nation in party discovery.  In order to produce the very same documents in Live Nation's possession, WME would need to comb through terabytes of data spread across computer servers and 166 individual work stations physically located at WME offices in four different cities around the United States.  Additionally, to produce hard copy files, WME would need to retrieve each physical file from its respective storage location, the vast majority of which are maintained in off-site storage.  Obtaining and reviewing responsive electronic and hard copy documents would cost WME countless man hours and millions of dollars.  Accordingly, the request is entirely duplicative and wasteful.

Finally, while WME has not collected and reviewed the documents, WME is informed and believes that responsive documents would contain confidential and proprietary information belong to WME's clients.  A protective order is insufficient protection to WME's clients and other third parties, whose confidential information would be provided to entities that frequently negotiate across the table from them. WME's ability to negotiate future appearance deals on behalf of its clients would be significantly impaired if its clients' confidential information were disclosed in this litigation.  Likewise, to the extent any documents contain privileged information, Plaintiffs are not entitled to discovery as to those documents.

## REQUEST NO. 7

Each and every contract, memorandum of understanding, term sheet, deal sheet, confirmatory email or correspondence or other agreement covering any and all of the appearances of Your and/or Marc Geiger's and/or Rob Beckham's and/or Cara Lewis' and/or Barbara Skydel's client-artists, including but not limited to Nine Inch Nails, John Mayer, Rascall Flatts, Brad Paisley, Eminem, Lil' Wayne, Kanye West, Tom Petty and/or Roger Waters, at Nissan anytime from January 1, 2003 through the present.

## OBJECTIONS TO REQUEST NO. 7

In addition to the General Objections, each of which is incorporated herein by this reference, WME further objects to this Request on the ground that it is overbroad and unduly burdensome in that it seeks far-reaching discovery from a third-party without first exhausting efforts to obtain such information from party witnesses in violation of Federal Rules of Civil Procedure 45. Given that Plaintiffs' Complaint states specific facts relating to but one venue (Merriweather) and one artist (The Jonas Brothers), the Request is also overbroad in that it requests production of documents relating to artists, deals and venues not specifically at issue in Plaintiffs' Complaint and is, in substance, an impermissible "fishing expedition" by Plaintiffs.  The Request is also overbroad in that it purportedly includes, among other things, all contracts or references to contracts created during a nearly 7-year period. WME further objects in that the Request seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. WME further objects to the extent it seeks confidential and proprietary information, trade secrets, including confidential information belonging to third parties, including all of WME's clients, and/or other information protected from disclosure by WME's agreements or duties to other third-parties.

## REASONS WHY WME MUST PRODUCE DOCUMENTS

Movants require these documents for the same reasons they require production of documents relating to the appearance of WME represented artists at Merriweather. For instance, documents reflecting that there were issues during an artist's prior appearances at Jiffy Lube Live (at the time the Subpoena was served Jiffy Lube Live was named Nissan Pavilion) would evidence that the artist subsequently appeared at Nissan in order to obtain a national tour, block-booked or multi-appearance promotional agreement with Live Nation. This is one of the few requests in which Movants seek documents beyond the time period of the alleged anti-competitive conduct because events occurring during an artist's earlier appearances at Nissan may be probative of the artist's reason for appearing at Nissan during the time period specifically at issue in this case. As only a relatively limited number of WME represented artists appeared at Nissan during the time period covered by the request, there is no reason why it should be unduly burdensome or oppressive to respond to produce responsive documents.

## WME'S REASONS WHY REQUEST NO. 7 SHOULD BE QUASHED

Request No. 7 is overbroad in that it seeks "each and every contract, memorandum of understanding, term sheet, deal sheet, confirmatory email or correspondence or other agreement" regarding any appearances by WME's clients at the Nissan Pavilion since 2003. Plaintiffs make no attempt to reasonably limit the request to artists that previously played at Merriweather and who switched to only playing the Nissan Pavilion. Indeed, the request appears to include contracts and documents of WME clients with long histories of playing at the Nissan Pavilion who have never demonstrated any desire to play at Merriweather, or artists that have consistently played both at Nissan and at Merriweather. Furthermore, if the artist's appearance at the Nissan Pavilion was a part of a multiple-appearance tour, Plaintiffs

also demand production of documents relating to the non-Nissan appearances, all of which have no relevance to Plaintiffs' claims.  The request also includes documents relating to the technical aspects of a performance, performers' travel and personal arrangements, and numerous other issues that are wholly irrelevant to Plaintiffs' dispute with Live Nation.  Significantly, Plaintiffs do not contend in their papers that this request is limited to the 29 WME clients discussed elsewhere, and may relate to any artist who played at Nissan at any time since 2003.

Additionally, given that the Nissan Pavilion is managed and operated by Live Nation, all documents responsive to this request will be produced by Live Nation in party discovery.  In order to produce the very same documents in Live Nation's possession, WME would need to comb through terabytes of data spread across computer servers and 166 individual work stations physically located at WME offices in four different cities around the United States.  Additionally, to produce hard copy files, WME would need to retrieve each physical file from its respective storage location, the vast majority of which are maintained in off-site storage.  Obtaining and reviewing responsive electronic and hard copy documents would cost WME countless man hours and millions of dollars.  Accordingly, the request is entirely duplicative and wasteful.

Finally, while WME has not collected and reviewed the documents, WME is informed and believes that responsive documents would contain confidential and proprietary information belong to WME's clients.  A protective order is insufficient protection to WME's clients and other third parties, whose confidential information would be provided to entities that frequently negotiate across the table from them.  WME's ability to negotiate future appearance deals on behalf of its clients would be significantly impaired if its clients' confidential information were disclosed in this litigation.  Likewise, to the extent any documents contain privileged information, Plaintiffs are not entitled to discovery as to those documents.

**REQUEST NO. 8**

Each and every document memorializing, generated during, reporting upon or otherwise relating to the negotiation of any and all of the appearances of Your and/or Marc Geiger's and/or Rob Beckham's and/or Cara Lewis' and/or Barbara Skydel's client-artists, including but not limited to Nine Inch Nails, John Mayer, Rascall Flatts, Brad Paisley, Eminem, Lil' Wayne, Kanye West, Tom Petty and/or Roger Waters, at Nissan during the 2003 to 2009 Seasons.

**OBJECTIONS TO REQUEST NO. 8**

In addition to the General Objections, each of which is incorporated herein by this reference, WME further objects to this Request on the ground that it is overbroad and unduly burdensome in that it seeks far-reaching discovery from a third-party without first exhausting efforts to obtain such information from party witnesses in violation of Federal Rules of Civil Procedure 45. Given that Plaintiffs' Complaint states specific facts relating to but one venue (Merriweather) and one artist (The Jonas Brothers), the Request is also overbroad in that it requests production of documents relating to artists, deals and venues not specifically at issue in Plaintiffs' Complaint and is, in substance, an impermissible "fishing expedition" by Plaintiffs. The Request is also overbroad in that it purportedly includes, among other things, all contracts or references to contracts created during a nearly 6-year period. WME further objects in that the Request seeks documents that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. WME further objects to the extent it seeks confidential and proprietary information, trade secrets, including confidential

information belonging to third parties, including all of WME's clients, and/or other information protected from disclosure by WME's agreements or duties to other third-parties.

## REASONS WHY WME MUST PRODUCE DOCUMENTS

Movants seek documents relating to the negotiation of WME represented artists' appearance at Jiffy Lube Live because inducements offered to artists to appear at that venue are highly significant. For instance, documents exchanged between Live Nation and WME during the negotiation of potential appearances at Nissan may reflect statements by Live Nation that the artists must appear at there as part of any national tour, multi-appearance or block-booked promotional agreement. Communications between WME and the artist or the artist's management may reflect the impact of any Live Nation demands on the artist's selection of a venue or otherwise reflect the reasons why the artist agreed to appear at Nissan. Drafts of contracts and emails exchanged during the negotiation of contracts are typically maintained in contract files and it should, accordingly, not be difficult for WME to produce the requested documents.

## WME'S REASONS WHY REQUEST NO. 8 SHOULD BE QUASHED

Request No. 8 contains the same broad language as Requests Nos. 2, 5 and 6, and is objectionable for the same reasons set forth above. This request seeks "each and every document memorializing, generated during, reporting upon or otherwise relating to" the negotiation of any appearances by WME clients at the Nissan Pavilion since 2003.

Plaintiffs' request is expansively drafted and literally encompasses every physical and electronic document generated by WME since 2003. Plaintiffs make no attempt to reasonably limit the request to artists that previously played at Merriweather and who switched to only playing the Nissan Pavilion. Indeed, the request appears to include contracts and documents of WME clients with long

histories of playing at the Nissan Pavilion who have never demonstrated any desire to play at Merriweather, or artists that have consistently played both at Nissan and at Merriweather.  Furthermore, if the artist's appearance at the Nissan Pavilion was a part of a multiple-appearance tour, Plaintiffs also demand production of documents relating to the non-Nissan appearances, all of which have no relevance to Plaintiffs' claims.  The request also includes documents relating to the technical aspects of a performance, performers' travel and personal arrangements, and numerous other issues that are wholly irrelevant to Plaintiffs' dispute with Live Nation.  Significantly, Plaintiffs do not contend in their papers that this request is limited to the 29 WME clients discussed elsewhere, and may relate to any artist who played at Nissan at any time since 2003.

Given its nonsensical demand for any document "generated during" negotiations for Nissan appearances, the request encompasses documents relating to every geographic location that Live Nation does business, nearly all of which are entirely unrelated to Plaintiffs' alleged Baltimore business, and their claimed business losses in the Baltimore region.  Such documents fall outside the scope of discoverable information.  See American Key Corporation v. Cole National Corporation, 762 F.2d 1569, 1576-77 (11th Cir. 1985) (district court did not abuse its discretion by restricting discovery to the region where the plaintiff conducted business); Manufacturing Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1043 (11th Cir. 1982) (court denied discovery into a related market and instead limited discovery to the scope of the relevant market); see also Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1354 (Fed. Cir. 1999) (defendant's market power in another market was irrelevant to the issues of the case).  Moreover, the request includes documents relating to the technical aspects of a performance, performers' travel and personal arrangements, and numerous other issues that are wholly irrelevant to Plaintiffs'

dispute with Live Nation.  There is no legitimate basis upon which Plaintiffs can claim entitlement to such an extraordinary discovery request, and Plaintiffs do not come close in justifying their position.

Additionally, most documents responsive to this request will be produced by Live Nation in party discovery.  In order to produce the very same documents in Live Nation's possession, WME would need to comb through terabytes of data spread across computer servers and 166 individual work stations physically located at WME offices in four different cities around the United States.  Additionally, to produce hard copy files, WME would need to retrieve each physical file from its respective storage location, the vast majority of which are maintained in off-site storage.  Obtaining and reviewing responsive electronic and hard copy documents would cost WME countless man hours and millions of dollars.  Accordingly, the request is entirely duplicative and wasteful.

Finally, while WME has not collected and reviewed the documents, WME is informed and believes that responsive documents would contain confidential and proprietary information belong to WME's clients.  A protective order is insufficient protection to WME's clients and other third parties, whose confidential information would be provided to entities that frequently negotiate across the table from them. WME's ability to negotiate future appearance deals on behalf of its clients would be significantly impaired if its clients' confidential information were disclosed in this litigation.  Likewise, to the extent any documents contain privileged information, Plaintiffs are not entitled to discovery as to those documents.

**REQUEST NO. 9**

Any and all documents constituting, memorializing, reporting upon, or referring to any communications between any Live Nation employee, on the one part, and You and/or Marc Geiger and/or Rob Beckham and/or Cara Lewis and/or Barbara Skydel on the other part, concerning the promotion of concerts or any and all of the

appearances of Your and/or Marc Geiger's and/or Rob Beckham's and/or Cara Lewis' and/or Barbara Skydel's client-artists, including but not limited to Nine Inch Nails, John Mayer, Rascall Flatts, Brad Paisley, Eminem, Lil' Wayne, Kanye West, Tom Petty and/or Roger Waters, at venues Live Nation owns, leases or manages, or at which it has booking rights or a revenue sharing agreement.

## OBJECTIONS TO REQUEST NO. 9

In addition to the General Objections, each of which is incorporated herein by this reference, WME further objects to this Request on the ground that it is overbroad and unduly burdensome in that it seeks far-reaching discovery from a third-party without first exhausting efforts to obtain such information from party witnesses in violation of Federal Rules of Civil Procedure 45. The Request is also overbroad in that it requests production of documents relating to artists and deals not specifically at issue in Plaintiffs' Complaint and is, in substance, an impermissible "fishing expedition" by Plaintiffs. The Request is also overbroad in that it purportedly includes, among other things, documents and communications by administrative and support staff and other individuals, that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. WME further objects to the extent it seeks confidential and proprietary information, trade secrets, including confidential information belonging to third-parties, including all of WME's clients, and/or other information protected from disclosure by WME's agreements or duties to other third-parties. The Request is also overbroad in that it fails to state an applicable time frame.

## REASONS WHY WME MUST PRODUCE DOCUMENTS

The parties' positions are the same as Request Nos. 1, 3 and 4 above.  Further, the requested documents are probative of Live Nation's control over artists whom it promotes.

## WME'S REASONS WHY REQUEST NO. 9 SHOULD BE QUASHED

Request No. 9 contains the same broad language as Requests Nos. 2, 5, 6 and 8, and is objectionable for the same reasons set forth above.

## REQUEST NO. 12

Any and all documents constituting, memorializing, reporting upon or referring to any communications between any Live Nation employee, on the one part, and You and/or Marc Geiger and/or Rob Beckham and/or Cara Lewis and/or Barbara Skydel on the other part, concerning the promotion of concerts or any and all of the appearances of Your and/or Marc Geiger's and/or Rob Beckham's and/or Cara Lewis' and/or Barbara Skydel's client-artists, including but not limited to Nine Inch Nails, John Mayer, Rascall Flatts, Brad Paisley, Eminem, Lil' Wayne, Kanye West, Tom Petty and/or Roger Waters, at venues Live Nation does not own, lease or manage, or at which it does not have booking rights or a revenue sharing agreement.

## OBJECTIONS TO REQUEST NO. 12

In addition to the General Objections, each of which is incorporated herein by this reference, WME further objects to this Request on the ground that it is overbroad and unduly burdensome in that it seeks far-reaching discovery from a third-party without first exhausting efforts to obtain such information from party witnesses in violation of Federal Rules of Civil Procedure 45. The Request is also overbroad in that it requests production of documents relating to artists and deals not specifically at issue in Plaintiffs' Complaint and is, in substance, an impermissible "fishing expedition" by Plaintiffs. The Request is also overbroad in that it purportedly includes, among other things, documents and communications by administrative and support staff and other individuals, that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. WME further objects to the extent it seeks confidential and proprietary information, trade secrets, including confidential information belonging to third-parties, including all of WME's clients, and/or other information protected from disclosure by WME's agreements or duties to other third-parties. The Request is also overbroad in that it fails to state an applicable time frame.

## REASONS WHY WME MUST PRODUCE DOCUMENTS

As Movants maintain that Live Nation dissuades artists participating in national, block-booked and multi-appearance tours it promotes from appearing at venues it does not control, communications between WME and Live Nation as to the appearance of WME represented artists at independent venues Live Nation are highly relevant to Movants' claims.  As Movants have agreed that the Subpoena applies only to twenty-nine artists, the request is limited in scope.  The artists to whom the Subpoena applies are believed to have participated in Live Nation promoted national,

block-booked and/or multi-appearance tours and who have a level of popularity that they would likely appear at amphitheatres such as, Merriweather and Jiffy Lube Live.

**WME'S REASONS WHY REQUEST NO. 12 SHOULD BE QUASHED**

While Requests Nos. 2, 5, 6, 8 and 9 pertain to appearances by WME clients at all Live Nation venues, Request No. 12 pertains to appearances at all non-Live Nation venues.  Accordingly, the aggregate effect of Plaintiffs' Subpoena is to command production of all documents referring to, or generated during, or tangentially related to the appearance by WME clients at literally every venue in the country.  While Plaintiffs conclude that such discovery is justified, they fail to articulate a single reason how documents relating to appearances at non-Live Nation venues could possibly evidence that Live Nation "dissuades artists…from appearing at venues it does not control…"  This request fails for the same reasons set forth above and is emblematic of the sort of near-limitless fishing expedition upon which Plaintiffs seek to embark.

**REQUEST NO. 15**

All communications between Clear Channel Communications, Inc., Clear Channel Entertainment and/or Live Nation, on the one part, and You and/or any of Your employees, on the other part, concerning providing radio airplay to artists promoted by promoters unaffiliated with Clear Channel Communications, Inc., Clear Channel Entertainment or Live Nation or the advertising, promotion or marketing of concerts promoted by any such unaffiliated promoters.

**OBJECTIONS TO REQUEST NO. 15**

In addition to the General Objections, each of which is incorporated herein by this reference, WME further objects to this Request on the ground that it is overbroad and unduly burdensome in that it seeks far-reaching discovery from a third-party without first exhausting efforts to obtain such information from party witnesses in violation of Federal Rules of Civil Procedure 45. The Request is also overbroad in that it requests production of documents relating to artists and deals not specifically at issue in Plaintiffs' Complaint and is, in substance, an impermissible "fishing expedition" by Plaintiffs.  The Request is also overbroad in that it

purportedly includes, among other things, documents and communications by administrative and support staff and other individuals, that are neither relevant nor reasonably calculated to lead to the discovery of admissible evidence. WME further objects to the extent it seeks confidential and proprietary information, trade secrets, including confidential information belonging to third-parties, including all of WME's clients, and/or other information protected from disclosure by WME's agreements or duties to other third-parties. The Request is also overbroad in that it fails to state an applicable time frame.

## REASONS WHY WME MUST PRODUCE DOCUMENTS

Live Nation was previously owned by Clear Channel Communications, one of the largest owners and operators of music radio stations in the country.  Movants allege that, while it owned Live Nation, Clear Channel refused to provide radio airplay (which is crucial to artists to develop and increase a fan base) and/or to advertise concerts promoted by Live Nation's competitors.  Movants maintain that Live Nation established monopoly power in the promotion of concerts through this (as well as other) anticompetitive practices.  These allegations are supported by the decision of the Court in Nobody In Particular Presents Inc v. Clear Channel Communications Inc., et al., 311 F. Supp. 2d 1048 (D. Colo. 2004) (holding that plaintiffs established a genuine issue of fact as to whether Clear Channel denied airplay to artists promoted by rival promoters) and testimony, including by noted artists, before the Senate Committee on Commerce, Science and Transportation in hearings on Media Ownership (see *Media Ownership: Hearing before the Comm. on Commerce, Science, and Transportation, United States Senate*, 108th Cong. 34-35 (2003) (wherein Don Henley, Recording Artists' Coalition, testified that Clear Channel was wielding its power in the radio market to force artists to, among other things, perform promotional concerts in its venues.)).

Movants' request for any documents relating to communications between WME and Live Nation or Clear Channel as to radio airplay or advertising for its artists is

directly related to these well-founded allegations.  WME should accordingly be required to produce all documents responsive to this request.

**WME'S REASONS WHY REQUEST NO. 15 SHOULD BE QUASHED**

This request is overbroad and seeks documents unrelated to the underlying dispute.  As drafted, the request encompasses, among other things, all communications with Live Nation and/or Clear Channel Communications relating to airplay and commercials literally anywhere in the country that Live Nation and/or Clear Channel Communications do business.  Given that the above-captioned action is a regional dispute between a local Baltimore promoter and Live Nation, Plaintiffs have no right to such broad discovery.  See American Key Corporation v. Cole National Corporation, 762 F.2d 1569, 1576-77 (11th Cir. 1985) (district court did not abuse its discretion by restricting discovery to the region where the plaintiff conducted business); Manufacturing Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1043 (11th Cir. 1982) (court denied discovery into a related market and instead limited discovery to the scope of the relevant market); see also Intergraph Corp. v. Intel Corp., 195 F.3d 1346, 1354 (Fed. Cir. 1999) (defendant's market power in another market was irrelevant to the issues of the case).

Moreover, the request is unduly burdensome.  To produce electronic and hard copy documents relating to every airplay or commercial negotiation between WME and Live Nation and/or Clear Channel Communications in the entire country since 2006 is an enormous task.  Especially given that Plaintiffs do not limit this request to the 29 artists referenced elsewhere, this request broadly relates to all of WME's airplay and commercial negotiations for virtually every client.  Many of the documents encompassed by this request will be in Live Nation's possession, custody or control.  Accordingly, Plaintiffs should be made to direct their efforts toward party discovery.

Finally, while WME has not collected and reviewed the documents, WME is informed and believes that responsive documents would contain confidential and proprietary information belong to WME's clients.  Likewise, to the extent any documents contain privileged information, Plaintiffs are not entitled to discovery as to those documents.

## MOVANTS' CONCLUSION

For the foregoing reasons, Movants request that this Court grant its Motion to Compel in its entirety.

## WME'S CONCLUSION

For the reasons set forth above, WME respectfully requests that the Court quash the Subpoena in its entirety.

*(signatures continued on next page)*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,


COZEN O'CONNOR


By: /s_____
        Daniel D. Harshman
        777 South Figueroa Street, Ste. 2850
        Los Angeles, California 90017
        Telephone:  215.892.7900
        Facsimile:  213.892.7999

        Attorneys for Plaintiffs and Movants




VENABLE LLP


By:    /s_____
        Michael B. Garfinkel (SBN 156010)
        Justin J. Lowe (SBN 223847)
        Jennifer Levin (SBN 252420)
        Email: mbgarfinkel@venable.com
                  jjlowe@venable.com
                  jlevin@venable.com
        2049 Century Park East, Suite 2100
        Los Angeles, CA 90067
        Telephone:  (310) 229-9900
        Facsimile:  (310) 229-9901

        Attorneys for Non-Party Respondent
        William Morris Endeavor
        Entertainment, LLC

Dated:  September ___, 2010